## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Marques Dwell Armstrong, Jr.,
*also known as* Kease,

        Defendant.

Case No. 21-cr-228 (DWF/ECW)

**ORDER
AND
REPORT AND RECOMMENDATION**

On October 26, 2021, a grand jury indicted Defendant Marques Dwell Armstrong, Jr., also known as "Kease" ("Defendant" or "Armstrong") on a count of Possession of a Machinegun in violation of 18 U.S.C. §§ 922(o)(1) and 924(a)(2) (Count 1) and a count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 2). (Dkt. 1 at 1-2.)[1]

This matter is before the Court on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 25) ("Motion to Suppress")[2] and Defendant's Motion to Compel Attorney for the Government to Disclose Evidence

---

[1]    All page number citations are to the CM/ECF pagination unless otherwise noted.

[2]    Armstrong initially sought suppression of any physical evidence obtained as a result of the two search warrants at issue on the basis that: (1) reliability of the confidential informant ("CI") was not established; (2) the search warrants constituted a fishing expedition as there was insufficient nexus between Armstrong's gun possession and the basis for the warrants; (3) the scope of areas to be searched was overbroad; and (4) the scope of timeframe for the search was overbroad. (Dkt. 25 at 1-3.) Armstrong did not continue to argue that the timeframe was overbroad in his post-hearing briefing. (*See generally*, Dkts. 31, 41, 51, 53.)

Favorable to the Defendant[3] (Dkt. 20) ("Motion to Compel").  This case has been
referred to the undersigned United States Magistrate Judge for a report and
recommendation as to the Motion to Suppress and an order as to the Motion to Compel
pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The Court held an initial hearing on the Motions on March 8, 2022, during which
the Court admitted Government Exhibits 1 and 2, absent any objections.  (Dkts. 29, 37.)
Benjamin Bejar, Assistant United States Attorney, appeared on behalf of the United
States of America (the "Government") and Lisa Lopez, Assistant Federal Defender,
appeared on behalf of Armstrong, who was present at the hearing.  (*Id.*)  Armstrong filed
a post-hearing brief in support of the Motions on March 22, 2022 (Dkt. 31); the
Government filed a post-hearing opposition brief on April 26, 2022 (Dkt. 36); and
Armstrong filed a post-hearing reply brief on May 9, 2022.  (Dkt. 41).

As detailed in Section I.C below, the Court held another hearing on the Motions
on June 29, 2022 during which the Government presented a witness and offered a third
exhibit.  (Dkts. 46, 49.)  LeeAnn Bell, Assistant United States Attorney, appeared on

---

[3]     Given the Government's objection to the Motion to Compel, at the March 8, 2022
hearing, the Court granted the Motion to Compel in part "insofar as the Government shall
comply with its requirement to disclose materials covered by *Brady v. Maryland*, 373
U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and
further insofar as within ten (10) days of the date of this Order, the Government must
disclose all *Brady*/*Giglio* information in its possession or of which it has become aware
as of the date of this Order, if not previously disclosed, and must promptly supplement its
disclosure upon receipt of any additional *Brady*/*Giglio* information not previously
disclosed," took the Motion under advisement "as to the Government's argument
regarding the timing to produce witness impeachment materials or witness statements in
view of the Jencks Act," and ordered additional briefing as to this issue.  (Dkt. 30 at 2-3.)

behalf of the Government and Sarah Weinman and Manvir Atwal, Assistant Federal Defenders, appeared on behalf of Armstrong, who was present at the hearing. (Dkts. 46, 49.) Armstrong filed a post-hearing brief on July 20, 2022 (Dkt. 51); the Government filed a response on July 27, 2022 (Dkt. 52); and Armstrong filed a reply on August 3, 2022. (Dkt. 53.) This matter is therefore ripe for decision. For the reasons set forth below, the Court recommends that Defendant's Motion to Suppress be granted and grants Defendant's Motion to Compel insofar as the Government must disclose *Giglio* material no later than seven (7) days before trial, or when ordered by the trial judge to disclose trial witnesses, whichever is earlier, and is otherwise denied.

## I.      BACKGROUND

### A.      The iPhone Warrants

On October 14, 2021, Sergeant Jaclyn Johnson[4] of the Minneapolis Police Department ("MPD") Violent Crimes Investigation Team ("VCIT"), which is tasked with investigating shootings, applied for and received two warrants from the same Hennepin County District Judge authorizing the search of two iPhones. (Gov't Ex. 1; Gov't Ex. 2.) The two warrants and supporting materials were admitted as Government Exhibits 1 and 2 at the March 8, 2022 hearing. (Dkt. 37 at 22:1-9.)[5] The first warrant was for an "Apple

---

[4]      Sergeant Jaclyn Johnson was named Jaclyn Tuma when she applied for the iPhone Warrants and when they issued. (*See* Gov't Ex. 1 at 1; Gov't Ex. 2 at 1; Dkt. 49 at 7:11-16, 14:20-15:1.)

[5]      All citations to transcripts are in page:line format.

iPhone with property number 18250[XXX], with photo compilation case" ("iPhone #1")

for the following items:

> -account or subscriber information and contact lists

> -texts and call logs, both via SMS messages or via mobile text applications contained on the phone

> -video, photos and other media

> -social media, email and communications via applications on the phone

> Time or date stamped data shall be limited to those on or after 6/10/2021.

(Gov't Ex. 1 at 1.)

The second warrant was for an "Apple iPhone with property number

18250[XXX], without case from fanny pack" ("iPhone #2") and sought the same

evidence as the first warrant. (Gov't Ex. 2 at 1.) Sergeant Johnson applied for both

warrants on the ground that the evidence sought from iPhone #1 and iPhone #2

"constitutes evidence which tends to show a crime has been committed, or tends to show

that a particular person has committed a crime." (Gov't Ex. 1 at 1; Gov't Ex. 2 at 1.)

Government Exhibits 1 and 2 each comprise an Application for Search Warrant on

pages 1-4 of the Exhibit and a Search Warrant, where the Search Warrant is on pages 5-7

of the Exhibit. (Gov't Ex. 1; Gov't Ex. 2.) The Applications for both Search Warrants

rely on identical affidavits[6] ("Affidavits"). (*See* Gov't Ex. 1 at 1-2; Gov't Ex. 2 at 1-2.)

The Court refers to the Applications for Search Warrant and Search Warrants collectively

---

[6]     The Affidavits in support of the applications for the iPhone Warrants are four
pages. (*See* Gov't Ex. 1 at 1-4; Gov't Ex. 2 at 1-4.) Page 3 of both Affidavits is blank.
(*Id.*)

as the "iPhone Warrants," unless the Court indicates it is specifically discussing the

Search Warrant portion at pages 5-7.

In her Affidavits, Sergeant Johnson stated that she is a sergeant with the MPD

VCIT who is tasked with investigating shootings in the city; in 2019, she was assigned a

shooting case in which "Marques Dwell Armstrong [date of birth] was charged with and

pled to an Assault 2 shooting"[7]; and Armstrong was released from the custody of the

Minnesota Department of Corrections ("DOC") and placed on supervised release on June

10, 2021.  (Gov't Ex. 1 at 1; Gov't Ex. 2 at 1.)  According to Sergeant Johnson,

Armstrong had violated his conditions of release, and as a result, a "warrant was issued

for him," along with a federal probation warrant.  (Gov't Ex. 1 at 1-2; Gov't Ex. 2 at 1-2.)

Sergeant Johnson stated that at an unspecified time,

> Special Agent Beau Wethington contacted Your Affiant with information
> about Armstrong including CI information that he had a gun and a current
> phone number for him. Your affiant wrote a Ping warrant to include GPS
> information about Armstrong's location in hopes of aiding in his location and
> arrest.
>
> On the morning of 10/12/2021, Your Affiant, other ATF officers and special
> agents from the ATF gathered in the area of Armstrong's phone locations at

---

[7]     The Court understands "Assault 2" to refer to Minn. Stat. § 609.222, Assault in the Second Degree, which provides:

> Subdivision 1. Dangerous weapon. Whoever assaults another with a
> dangerous weapon may be sentenced to imprisonment for not more than
> seven years or to payment of a fine of not more than $14,000, or both.
>
> Subd. 2. Dangerous weapon; substantial bodily harm. Whoever assaults
> another with a dangerous weapon and inflicts substantial bodily harm may
> be sentenced to imprisonment for not more than ten years or to payment of a
> fine of not more than $20,000, or both.

the time. It was at an apartment building in Roseville that was connected with a female that Armstrong had contact with several times.

While Your Affiant and her partners were doing surveillance, Armstrong walked out of the building got into the female's vehicle. As officers were moving to arrest Armstrong, he attempted to flee but crashed almost immediately, then fled on foot. Armstrong was taken in[t]o custody after a short foot chase and a loaded Glock 26 with a "switch" making it fully automatic was located in a large tuft of grass that Armstrong fell into while running.

Officers located a cell phone in the cupholder of the vehicle Armstrong used to attempt to flee. It was labeled with property number 18250[XXX]. They also located an additional cell phone which was powered off in a fanny pack which was on his person when he was arrested. That was labeled with property number 18250[XXX]. Your Affiant believes that Armstrong has likely used both phones since the time of his release as kept both phones on or close to his person [sic].

Your Affiant requests the Court's permission to search the cell phone for evidence of Armstrong's weapons possession and any other associated violence since his release on 6/10/2021. This would include subscriber or account information that would confirm that the phone belongs to or has been used by Armstrong. Your Affiant also requests to document texts and call logs from the time of Armstrong's release from DOC in an effort to determine when Armstrong acquired his gun and the "switch" installed on it to make it fully automatic. Your Affiant requests to search contact lists that might indicate who Armstrong was communicating with regarding his weapon and its modification or any violence that might be associated with Armstrong or his gun. Your Affiant requests to search media contained on the phone including videos and photos that would indicate weapons possession, [t]he arrested parties [sic] associations, the arrested parties [sic] locations at the time of associated violence, or his clothing at and around the time of associated violence being investigated by Your Affiant and other colleges [sic]. Your Affiant requests to search any social media, email and other types of messaging on the phone as they are common modes of communication that would include all the evidence your affiant is attempting to locate. Your Affiant requests to search location data that might indicate where the phone was located at the times of incidents being investigated.

(Gov't Ex. 1 at 2; Gov't Ex. 2 at 2.)

6

Sergeant Johnson requested to search iPhone #1 and iPhone #2 between the hours of 7am and 8pm for the stated evidence and to seize and keep the evidence in custody until dealt with according to law.  (Gov't Ex. 1 at 4; Gov't Ex. 2 at 4.)  The iPhone Warrants were issued on the same day, that is October 14, 2021.  (Gov't Ex. 1 at 5-7; Gov't Ex. 2 at 5-7.)

Prior to the March 8, 2022 hearing on the Motion to Suppress, the parties had agreed that the Court would conduct a "four-corners" review of the iPhone Warrants to determine if they were supported by probable cause.  (*See* Dkt. 28 at 10; *see also* Dkt. 31 at 2.)  On March 7, 2022, the Government's attorney emailed the iPhone Warrants to the undersigned's chambers (copying Armstrong's counsel) indicating the Government intended to offer them as Government Exhibits 1 and 2.  But the Government's email also included a third warrant, proposed Government Exhibit 3, which the Government intended to use at the hearing to establish that the exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), applied to the iPhone Warrants.  In response, Armstrong's attorney sent an email stating she would confer with the Government's attorney to determine whether Armstrong objected to the admission of a document outside of the four-corners of the iPhone Warrants for purposes of a "four-corners" review for probable cause.  Neither attorney sent any additional emails to the undersigned's chambers.

**B.    March 8, 2022 Hearing**

At the March 8 hearing ("March 8 Hearing"), the Government brought a witness to lay foundation and authenticate Government Exhibit 3.  (Dkt. 37 at 13:24-14:13.)  Armstrong's attorney stated that based on the parties' prior agreement, she was not aware

of the Government's intent to call a witness at the hearing and therefore objected to the Government's use of Exhibit 3 and to the witness testifying. (*Id.* at 15:9-23.)

Given the Government's delay in notifying Armstrong of its witness, for fairness purposes, and due to Armstrong's objections, the Court did not admit Government Exhibit 3 and did not allow any testimony from the witness at the March 8 Hearing. (*Id.* at 16:7-17:18.) The Court took the Motion to Suppress under advisement for a "four-corners" review of the iPhone Warrants, as well as to determine the applicability of the *Leon* good-faith exception to the iPhone Warrants based on the record at that time, and stated it would reopen the hearing if the Court determined, based on the record and the parties' post-hearing briefs, that there was a need to assess Government Exhibit 3 in conducting the *Leon* analysis. (*Id.* at 16:16-19:16, 20:17-21:24, 23:25-24:3.) Counsel did not object to proceeding in this manner. (*See id.*)

As to the Motion to Compel, the Court ordered the parties to meet and confer regarding the Government's position that witness impeachment materials are not subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), but are to be produced in accordance with the Jencks Act. (*Id.* at 11:1-12.) The Court took the Motion to Compel under advisement pending the parties' post-hearing briefs. (*Id.*; *see also* Dkt. 29.)

The parties thereafter filed their initial post-hearing briefs. (*See* Dkts. 31, 36, 41.) Based on the Court's review of the parties' submissions and the iPhone Warrants, the Court determined there was a need to assess proposed Government Exhibit 3 and the parties' arguments with respect to that proposed Exhibit, the Government's proposed witness, and *Leon*. (*See* Dkt. 42 at 3.) As a result, the Court found there was sufficient

8

good cause to re-open the hearing on the Motion to Suppress, "including to permit testimony as to proposed Government Exhibit 3." (*Id.* (citing 2014 Advisory Committee's Note to D. Minn. LR 12.1; *United States v. McGregor*, 785 F. Supp. 2d 1253, 1254-56 (M.D. Ala. 2011)).) The Court also found "that the ends of justice served by reopening the hearing outweigh[ed] the best interest of the public and Armstrong in a speedy trial based on the fact that Government Exhibit 3 may be relevant to the *Leon* analysis as to Government Exhibits 1 and 2"; that "the additional time is needed to permit the parties to prepare for the June 29, 2022 hearing, including for direct and cross-examination"; and that these "factors also constitute the good cause required under Local Rule 12.1(e)." (*Id.* at 4-5 (citing 18 U.S.C. §§ 3161(h)(1)(D), 3161(h)(7)(A); D. Minn. LR 12.1(e); 2014 Advisory Committee's Note to D. Minn. LR 12.1).)

## C.      June 29, 2022 Hearing

On June 29, 2022, the Court held the re-opened hearing on the Motion to Suppress ("June 29 Hearing"), at which it admitted Government Exhibit 3 and allowed the testimony of the Government's witness. (Dkt. 46; Dkt. 49 at 7:17-9:10, 13:17-22.) At the hearing, Armstrong objected to the admission of proposed Government Exhibit 3, to the witness testifying, to the Court's decision to reopen the hearing on Speedy Trial grounds, and to the hearing proceeding. (Dkt. 49 at 7:17-9:10, 13:17-22.) The Court overruled Armstrong's objections for reasons stated in its May 25, 2022 Order re-opening the hearing. (*Id.*)

At the hearing, Sergeant Johnson testified that she has been employed as a police officer with MPD since 2008 and is currently assigned to the VCIT, where she

investigates Assault 2 shootings.  (Dkt. 49 at 11:8-12:10.)  Sergeant Johnson discussed the various positions she held during her time with the MPD, including in the Strategic Intelligence Center for seven years, during which time she was tasked with evaluating and examining gang members, including their communication styles, clothing, hand styles, photos, graphics, social media, and the photos taken upon their arrests.  (*Id.* at 11:17-12:5, 27:10-36:12.)  Sergeant Johnson testified that she first became familiar with Armstrong while performing gang documentation work in 2016 for a federal weapons' conspiracy case which revealed Armstrong was an associate of a north side hybrid gang known as the Stick Up Boys or "SUB" and that she also worked on a shooting-related case that was brought against Armstrong in 2019.  (*Id.* at 15:8-17:1-13, 18:22-19:2, 19:11-22:7, 27:10-29:1, 30:3-36:12, 46:17-47:15, 51:22-52:5.)

As it relates to this case, Sergeant Johnson testified that her investigation of Armstrong began in September 2021.  (*Id.* at 43:8-17.)  Sergeant Johnson was contacted by Special Agent William ("Beau") Wethington of the ATF who informed her that he had retrieved information from a confidential informant[8] ("CI") that Armstrong was in possession of a gun that he had been seen with several times, that Armstrong drove a red Jeep and was utilizing a specific phone number, and that officers were aware that there was an outstanding Minnesota DOC warrant, as well as a federal warrant, for Armstrong. (*Id.* at 22:6-27:9, 36:13-24, 37:7-39:3, 43:18-46:16.)  Prior to applying for the iPhone

---

[8]     On cross-examination, Sergeant Johnson stated that she believed Special Agent Wethington referred to this individual as a "confidential source" or "CS."  (Dkt. 49 at 45:13-46:5.)

Warrants, officers determined that the phone number obtained from the CI belonged to a woman known to be Armstrong's girlfriend and also discovered through the motor vehicle database that the red Jeep referenced by the CI was registered to Armstrong's girlfriend.  (*Id.* at 37:19-39:3.)  Officers began surveilling the red Jeep and Armstrong's girlfriend's apartment in late September of 2021.  (*Id.* at 47:20-48:18.)  On October 12, 2021, officers informed Sergeant Johnson over a radio that they observed Armstrong leaving his girlfriend's apartment and enter the red Jeep and stated that the red Jeep crashed after a short chase.  (*Id.* at 39:9-40:3, 48:24-49:3.)

Sergeant Johnson testified that she applied for the iPhone Warrants after Armstrong's arrest and identified Government Exhibit 3 as a tracking warrant for the phone number that was associated with Armstrong ("Tracking Warrant").  (*Id.* at 12:14-13:16, 13:24-14:3, 39:4-8, 39:14-18.)  Sergeant Johnson stated that she referenced the Tracking Warrant in her application for the iPhone Warrants to create continuity because the judge that signed the Tracking Warrant was also the judge that she submitted the iPhone Warrants to, and that the same judge signed all three Warrants.  (*Id.* at 14:4-19.)  Sergeant Johnson sought to search iPhone #1 and iPhone #2 from the time Armstrong was released from DOC custody on June 10, 2021 through the time the iPhones were seized to determine when the firearm and sear (which is "often a separate piece that can be put on to an existing gun") were installed and because information regarding firearm and sears and how they were acquired may be found on the cell phone of a felon in possession of a firearm.  (*Id.* at 41:8-42:5.)

Sergeant Johnson testified that based on her training and experience, it is common for gang members to have access to firearms, and that based on her training and experience, it is "incredibly common" for gang members to have photos of guns, drugs, and other gang-related items on their cell phones. (*Id.* at 40:4-41:7.) At the end of Sergeant Johnson's testimony, the Court stated: "I have a question actually for Sergeant Johnson. I'd like to know how the warrants were executed, the two cell phone warrants." (*Id.* at 52:16-18.) Sergeant Johnson responded:

> The warrants were -- the two cell phone warrants were signed by a Hennepin County Judge, and then I took the cell phones themselves and the warrants themselves and actually walked them up one flight of stairs to our crime lab's forensic computer division and actually submitted them to the people who are trained to do the extractions. I gave them to them myself.

(*Id.* at 52:19-25.)

As to the Motion to Compel, Armstrong maintained at the hearing that impeachment materials under *Giglio* should be disclosed at the same time that the Government discloses exculpatory materials under *Brady*, and not in accordance with the Jencks Act. (*Id.* at 2:22-4:20.) Armstrong asked to supplement his briefs on the Motion to Suppress and Motion to Compel. (*Id.* at 4:15-20, 53:5-54:9.)

## II.    DISCUSSION

Armstrong moves to suppress evidence obtained as a result of the iPhone Warrants based on a "four-corners" review on the grounds that (1) the supporting Affidavits fail to establish probable cause because they do not state a nexus between the incriminating evidence sought and the basis for the iPhone Warrants; and (2) the iPhone Warrants fail to particularize the items to be searched and/or were overbroad. (Dkt. 51 at 4-7; *see also*

Dkt. 53 at 1-9.)  Armstrong also argues that the *Leon* good-faith exception is inapplicable

because the iPhone Warrants are facially deficient, and that Government Exhibit 3 fails to

establish the *Leon* good-faith exception.  (Dkt. 51 at 7-16; *see also* Dkt. 53 at 9-11.)  The

Government counters that the iPhone Warrants were supported by probable cause and

that even if they were not supported by probable cause, the Motion to Suppress should

still be denied because Sergeant Johnson relied on the iPhone Warrants in good faith.

(Dkt. 52 at 3-10; *see also* Dkt. 36 at 6-12.)

As it relates to the Motion to Compel, Armstrong disagrees with the Government's

statement that non-exculpatory impeachment materials of potential government witnesses

do not fall within the *Brady* rule, argues that *Giglio*, *supra*, relied on *Brady*, and asks the

Court to order production of materials that fall within the *Brady* rule, including "any and

all *Giglio* material" that is considered "material," well before trial.  (Dkt. 51 at 17-19; *see*

*also* Dkt. 53 at 11-14.)

Finally, in his brief filed after the June 29 Hearing, Armstrong renewed his

objection to the admission of Government Exhibit 3 and to Sergeant Johnson's testimony.

(Dkt. 51 at 4.)

The Government argues that non-exculpatory impeachment materials of potential

government witnesses do not constitute *Brady* materials, and that disclosing such

information would force it to "prematurely reveal its witness list to the defense, in

contravention to Rule 16," and will be unworkable and impracticable.  (Dkt. 36 at 13-17;

Dkt. 52 at 10-19.)  The Government does not take issue with Armstrong's contention that

*Giglio* relies on *Brady*, notes that its "reference to '*Brady*' regarding directly exculpatory

evidence, and its reference to '*Giglio*' regarding non-exculpatory impeachment evidence on trial witnesses, is in keeping with how those terms are used and referenced in case law and in the course of these proceedings[,]" states that such reference "was intended to reflect the common distinction, not to take issue with *Giglio*'s underpinnings," but maintains that it is not obligated to disclose non-exculpatory impeachment materials at the same time it discloses *Brady* materials.  (Dkt. 52 at 13-15.)  The Government also argued that the admission of Government Exhibit 3 and Sergeant Johnson's testimony was appropriate.  (Dkt. 52 at 2-3.)

The Court will first address Armstrong's arguments relating to the admission of Government Exhibit 3 and Sergeant Johnson's testimony and then turn to the arguments relating to the Motion to Suppress and Motion to Compel.

## A.      Government Exhibit 3 and Sergeant Johnson's Testimony

In his first brief filed after the June 29 Hearing, Armstrong reiterated his objections to the admission of Government Exhibit 3 and to Sergeant Johnson's testimony, arguing that "[t]he government has yet to offer a reasonable explanation for its failure to provide adequate notice of Government Exhibit 3 and its witness before the March 8, 2022, hearing."  (Dkt. 51 at 4.)  As the Government points out, Armstrong has identified no authority requiring the Government to provide notice of an exhibit before a motion hearing.  (*See* Dkt. 52 at 2.)  The Government also states it only brought Sergeant Johnson to the March 8 Hearing for the "limited purpose of authenticating [Government Exhibit 3] in the event the defendant objected on foundational grounds."  (*Id.* at 3.)  Finally, the Government argues that Armstrong has not identified any prejudice that was

not cured by the Court's decision to reopen the hearing and give counsel time to prepare. (*Id.*)

The Local Rules required the Government to disclose Sergeant Johnson as a witness before the March 8 Hearing. *See* D. Minn. LR 12.1(c)(3)(A). However, the Court may modify the schedule set forth in Local Rule 12.1 for "good cause," *see* D. Minn. LR 12.1(e), and the Court found good cause based on the need to assess proposed Government Exhibit 3 and related testimony (*see* Dkt. 42 at 2-3 (citing 2014 Advisory Committee's Note to D. Minn. LR 12.1, and *United States v. McGregor*, 785 F. Supp. 2d 1253, 1254-56 (M.D. Ala. 2011))). Moreover, Armstrong did not object to proceeding in this manner at the March 8 Hearing. (*See* Dkt. 37 at 16:16-19:16, 20:17-21:24, 23:25-24:3.) For these reasons, the Court sees no reason to disturb its decision overruling Armstrong's objections at the June 29 Hearing. (*See* Dkt. 49 at 7:17-9:10, 13:17-22.)

## B.   Motion To Suppress

As stated earlier, Armstrong argues that the iPhone Warrants were not supported by probable cause and were not sufficiently particular and/or were overbroad. (Dkt. 51 at 4-7; *see also* Dkt. 53 at 1-9.) While the Government acknowledged Armstrong's particularity argument in its pre-hearing response (Dkt. 28 at 10), it does not address or provide any response as to particularity or overbreadth in its post-hearing responses (*see* Dkts. 36, 52). The Government's responses focus on its contention that probable cause exist for the iPhone Warrants and that in any event, the *Leon* good-faith exception applies. (Dkt. 36 at 6-12; Dkt. 52 at 3-10.)

1.      **Applicable Legal Standards**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

A search warrant is valid under the Fourth Amendment when supported by probable cause. *United States v. Gabrio*, 295 F.3d 880, 882 (8th Cir. 2002). When a cell phone is seized incident to an arrest, officers must secure a search warrant that is supported by probable cause to search it. *Riley v. California*, 573 U.S. 373, 403 (2014). Probable cause "exists when a 'practical, common-sense' inquiry that considers the totality of the circumstances set forth in the information before the issuing judge yields a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)). An affidavit provides "probable cause for a warrant if it 'sets forth sufficient facts to establish that there is a fair probability that contraband or

16

evidence of criminal activity will be found in the particular place to be searched.'"
*United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010) (quoting *United States
v. Snyder*, 511 F.3d 813, 817 (8th Cir. 2008)).  And there must be "a nexus between the
[illegal activity] and the place to be searched before a warrant may properly issue[.]"
*United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000).

"An issuing judge's 'determination of probable cause should be paid great
deference by reviewing courts' and should be upheld if the judge had a 'substantial basis
for concluding that a search would uncover evidence of wrongdoing.'"  *Stevens*, 530 F.3d
at 718 (quoting *Gates*, 462 U.S. at 236) (cleaned up).  And the proponent of a suppression
motion on the basis of a Fourth Amendment violation bears "the burden of establishing
that his . . . Fourth Amendment rights were violated by the challenged search or seizure."
*Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

As for the exception set forth in *United States v. Leon*, 468 U.S. 897 (1984),
"'evidence seized pursuant to a search warrant issued by a magistrate [judge] that is later
determined to be invalid[ ] will not be suppressed if the executing officer's reliance upon
the warrant was objectively reasonable.'"  *United States v. Houston*, 665 F.3d 991, 994
(8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)).  The
Eighth Circuit has found the *Leon* exception may apply to warrants that are insufficiently
particular or overbroad.  *See, e.g.*, *United States v. Henderson*, 416 F.3d 686, 695 (8th
Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant);
*United States v. Curry*, 911 F.2d 72, 77-78 (8th Cir. 1990) ("[T]he *Leon* exception is not
automatically inapplicable in every case where a warrant is found invalid on the ground

17

that it is insufficiently particular.").  However, evidence obtained as a result of an

unconstitutional search should be suppressed under the following circumstances:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
>
> (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;
>
> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and
>
> (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431).

"In determining the presence of good-faith reliance on a judge-issued search

warrant, the court must consider [the] totality of circumstances, including information not

presented to the judge issuing the search warrant but known to the police officers."

*United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011).  The Eighth Circuit has found

that "in assessing whether reliance on a search warrant was objectively reasonable under

the totality of the circumstances, it is appropriate to take into account the knowledge of

an officer in the searching officer's position would have possessed."  *Curry*, 911 F.2d at

78.

Other relevant factors that courts consider in determining the applicability of the

good-faith exception include, among other things, whether the warrant was issued by an

unbiased judge, whether there was probable cause for the search, whether the application

was attached to the warrant, and whether in the context of the warrant, the officer had a

reasonable belief the warrant was limited to the seizure of more particular items. *See e.g.*, *Henderson*, 416 F.3d at 695; *Curry*, 911 F.2d at 78.

With these principles in mind, the Court considers the Affidavits submitted in support of the iPhone Warrants.

### 2. The Affidavits Do Not Establish Probable Cause to Believe the iPhones Would Contain Evidence of Armstrong's Weapons Possession and Any Other Associated Violence Since His Release on June 10, 2021

The Court first considers Armstrong's argument that the Affidavits do not establish probable cause due to insufficient nexus. In particular, Armstrong argues that "[w]hat is missing from the warrant application is any evidentiary 'nexus' which might suggest that the digital files within those smartphones contain any evidence to suggest that Mr. Armstrong knowingly possessed the charged firearm, or any other criminal activity" (Dkt. 31 at 7-8) and that the Affidavits "fail to state a nexus between the files found on the smartphones and any evidence of knowingly possessing a firearm" (Dkt. 51 at 4).

The Government responds that "precisely because cell phones are so ubiquitous and persons using cell phones store so much information on them, it was entirely reasonable for the issuing magistrate [judge] to find a substantial basis to believe that evidence of the defendant's possession of the fully automatic firearm would reasonably be found in the cell phones' contents." (Dkt. 36 at 10.) The Government also asserts that "[c]ourts have upheld searches of cell phones in firearms cases because the phones often contain evidence of their possession and transfer, including photographs, texts, and other documentation of the firearm's acquisition." (Dkt. 52 at 4).

Boiled down to essentials, the parties disagree about whether Sergeant Johnson needed to affirmatively state in the Affidavits that based on her training and experience, it was common for gang members or persons previously involved in shootings (as Armstrong was) to have photos of firearms or communications relating to their knowing possession of firearms on their cell phones.  The parties also dispute whether the Affidavits established probable cause to believe the iPhones would contain evidence of "any other associated violence."

As a starting point, "[t]he Fourth Amendment's guarantee against unreasonable searches extends to data on a person's private cellular telephone."  *United States v. Suellentrop*, 953 F.3d 1047, 1049 (8th Cir. 2020).  As recognized by the Eighth Circuit, "[t]he Supreme Court has emphasized that 'cell phones differ in both a quantitative and qualitative sense from other objects' due to the volume of personal information they store."  *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021) (citing *Riley*, 573 U.S. at 393) (cleaned up).

Here, the Government argues that "[c]ourts have upheld searches of cell phones in firearms cases because the phones often contain evidence of their possession and transfer, including photographs, texts, and other documentation of the firearm's acquisition." (Dkt. 52 at 4.)  The Government cites *United States v. Woods*, Case No. 18-cr-0153 (WMW/HB), 2019 WL 337590 (D. Minn. Jan. 28, 2019), in support of this argument. But as the Government acknowledges, "in *Woods*"—unlike here—"the affiant-officer noted that 'people who possess firearms and narcotics often retain photographic documentation on their cell phones.'"  (Dkt. 52 at 4.)  The Affidavits here contained no

20

such statement about firearms and photographic documentation on cell phones, nor did they explain what evidence of "any other associated violence" Sergeant Johnson sought or why she believed such evidence would be found on the iPhones.

To overcome this hurdle, the Government relies on *United States v. Murphy*, 69 F.3d 237 (8th Cir. 1995), and other cases (discussed in more detail below) for the proposition that although Sergeant Johnson "did not make a similar explicitly [sic] statement in her affidavits," such a "talismanic recitation" is not required. (Dkt. 52 at 4-7.) The Government also argues that "the Eighth Circuit has repeatedly noted that judges 'may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists.'" (*Id.* (citing *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009).)

In response, Armstrong points out that *Murphy* involved the search of a home, not a cell phone, and the U.S. Supreme Court has "observed" that searching a mobile phone "is even more invasive than searching a home." (Dkt. 53 at 5 (citing *Riley*, 573 U.S. at 396-97 (stating that "a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.")).) Armstrong also argues that the affidavit in *Murphy* contained additional statements that established probable cause. (*Id.* at 5-6.)

The Court acknowledges that judges "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists." *Keele*, 589

F.3d at 944.  The Government cites no case, however, finding probable cause based on an inference that cell phones belonging to and kept near a person who previously pleaded guilty in 2019 to an Assault 2 shooting and who was arrested in the vicinity of a firearm are likely to contain photos evidencing that person's unlawful possession of a firearm.  At least one court in another District has found no probable cause where:

> The only information in the affidavit indicating any likelihood that evidence of a crime might be found on [the defendant's] phone was the fact that he was arrested for an alleged drug conspiracy while he possessed the phone. Possessing a cell phone during one's arrest for a drug-related conspiracy is insufficient by itself to establish a nexus between the cell phone and any alleged drug activity.

*United States v. Ramirez*, 180 F. Supp. 3d 491, 495 (W.D. Ky. 2016).  The *Ramirez* court also rejected the argument that "the affidavit established a sufficient nexus because Ramirez possessed the phone at the time of his arrest, and 'cell phones and firearms are generally considered the "tools of the trade" of drug traffickers.'"  *Id.*  It also concluded the *Leon* good-faith exception did not apply.[9]  *Id.* at 496.

In *United States v. Woods*, which is a case from this District, the affidavit in support of the cell phone search contained a statement by a confidential reliable informant ("CRI") to law enforcement that Woods sold heroin and used his cell phones to do so, where the CRI had provided truthful information in the past.  No. 18-CR-0153 (WMW/HB), 2018 WL 7253603, at *4 (D. Minn. Nov. 16, 2018), *R. & R. adopted*, No.

---

[9]   The Sixth Circuit has suggested its approval of this decision, describing the court's decision in *Ramirez* finding no probable cause and the *Leon* exception did not apply as based on "very good reasons."  *United States v. Merriweather*, 728 F. App'x 498, 506 (6th Cir. 2018).

18-CR-0153 (WMW/HB), 2019 WL 337590 (D. Minn. Jan. 28, 2019).  The affiant also stated that in his training and experience, cell phones are used to store texts, photographs, messages, phone numbers, other contact information, maps and GPS locations, and call histories; and people who possess firearms and narcotics often retain photographic documentation on their cell phones.  *Id.*  Woods was stopped in a vehicle four hours after a shooting.  *Id.* at *3.  The next day, he made a call from jail attempting to obtain a firearm and stating the phone numbers for two people who could help were in his phone contacts, and his phone was at his home.  *Id.*  He told law enforcement he had two mobile phones and gave them the numbers.  *Id.*  A few days later, apparently after Woods was released, Woods was arrested, and one mobile phone was seized from Woods' person and two others were seized from the vehicle he was in when arrested, which was the same vehicle stopped in connection with the shooting incident.  *Id.*  U.S. Magistrate Judge Hildy Bowbeer concluded that these facts, along with others, established probable cause to believe that contraband or evidence of a crime would be found on Woods' cell phones and recommended denial of Woods' suppression motion, *id.* at 4, and U.S. District Judge Wilhelmina M. Wright adopted that recommendation, No. 18-cr-0153 (WMW/HB), 2019 WL 337590, at *3 (D. Minn. Jan. 28, 2019).

Similarly, in *United States v. Carter*, the court found probable cause existed to authorize the search of the defendant's cell phones because the affidavits supporting the warrants identified reasons why the affiant believed evidence of a crime may be found on the cell phones and the affiant explained his knowledge of the sort of information and files, including photos, text messages, and calls, that felons prohibited from possessing

firearms may possess on their cell phones.  Cr. No. 20-104, 2022 WL 2128509, at *4

(W.D. Penn. June 14, 2022).  And in *United States v. Griffin*, the court agreed that

"Defendants correctly point out that there is little explanation of how [the affiant] formed

the belief [that the defendant's cell phones contained evidence of the crimes of drug

possession, possession of a firearm with a controlled substance, and carrying a firearm by

a convicted felon], such as a statement about [the affiant's] training and/or experience

regarding drug interdiction, or other facts or statement connecting the alleged drug

trafficking discovered in the Louisiana stop to the cell phone in question," but

nonetheless found "a magistrate [judge] could infer that the three travelers appeared to be

connected to drug trafficking, and that their whereabouts and prior communications were

undoubtedly relevant to that offense," noting "[c]ourts have recognized the importance of

cell phones in coordinating criminal enterprises, particularly drug trafficking

conspiracies."  No. 2:17-CR-20639-TGB-MKM, 2022 WL 2072042, at *2 (E.D. Mich.

June 8, 2022).  This conclusion was buttressed by the fact that the affidavit set out a

factual basis describing the investigation, explaining that the defendants had been

arrested while travelling from Texas to Birmingham, Alabama with what police then

believed was a kilogram of heroin, the defendants gave conflicting stories about the

length of the trip and when they left Birmingham, and a field test performed on the

substance found concealed in the vehicle indicated the presence of heroin.  *Id.* at *3.

    In other words, the above cases establish more of a connection between the cell

phone that was searched and the alleged criminal conduct, regardless of whether the

affiant provided a "training-and-experience" statement.  The Government cites several

other cases where an affirmative "training-and-experience" statement was not required for probable cause. Having reviewed those cases, the Court finds they are not entirely persuasive because they address searches of residences for evidence of drug trafficking or child pornography and the affidavits contained more statements supporting a nexus between the sought-after evidence and the location to be searched. *See, e.g.*, *Keele*, 589 F.3d at 943-44 (finding sufficient probable cause for a search of the defendant's residence in part because the affidavit provided details connecting the defendant to a criminal activity and the affiant explained based on his experience why evidence relating to the defendant's possession, manufacture, and distribution of controlled substances would be found in the defendant's residence); *United States v. Wallace*, 550 F.3d 729, 731-33 (8th Cir. 2008) (finding sufficient probable cause for a search of the defendant's residence given the recitations in the supporting affidavit identifying the residence as where the defendant took suggestive photos of an 11-year-old and where the 11-year-old viewed photos of herself and a woman's "private" on the defendant's computer in his home); *United States v. Hager*, 710 F.3d 830, (8th Cir. 2013) (affirming the denial of the defendant's motion to suppress evidence obtained during a search of his residence where the warrant sought sexually suggestive images produced by one man depicting his four minor daughters that were subsequently emailed to the defendant); *Summage*, 481 F.3 at 1078 (finding sufficient probable cause supported a search of the defendant's new residence where the defendant was alleged to have recorded a mentally handicapped male having sex with a female at his old residence and then moved to the new residence); *United States v. Taylor*, Crim. No. 15-91(JNE/LIB), 2015 WL 4992443, at *2 (D. Minn.

Aug. 20, 2015) (denying a suppression motion for a search of the defendant's residence where the supporting affidavit described the defendant's ongoing drug trafficking activity and courts have concluded that the issuing judge could reasonably infer that evidence would be found at the trafficker's residence even though no "training-and-experience" statement).

Finally, in *Murphy*, the affiant stated they were:

> told by a confidential informant that Michael Murphy who was recently released from Department of Corrections for murder was living at [XXX] W. 5th in Joplin, Missouri. That he had in his possession the above items and was threatening to kill a Jew. That I have checked and found that Michael Murphy was released from the Department of Corrections in 1992 for murder and is living at [XXX] W. 5th in Joplin, Missouri.

69 F.3d at 240. The Eighth Circuit described this affidavit as stating "that a confidential informant had told [the affiant] that Murphy, a felon released from the Department of Corrections, possessed firearms at his home at [XXX] W. 5th in Joplin." *Id.* at 241. The Government notes that the affidavit did not state the CI "personally saw the firearms at the residence." (Dkt. 52 at 6 n.2.) While *Murphy* may be applicable as to the reliability of a CI or *Leon* exception, where the affidavit in *Murphy* stated the firearms were in the location to be searched (the residence), it is not particularly persuasive as to the issue of whether there was probable cause to believe evidence of criminal activity would be found on the iPhones in this case based on the Affidavits.

Having considered the cases carefully, and in view of the more invasive nature of a search of a cell phone than a residence—which is recognized by the U.S. Supreme Court and the Eighth Circuit—the Court concludes that they are not binding, and are not

persuasive in view of the facts of this case, as to whether the Affidavits established a sufficient nexus between the iPhones and evidence that Armstrong knowingly possessed a firearm.  The Affidavits in this case contain no statements that Armstrong had posted photos of himself with a firearm on social media, had sent photos of himself with a firearm to any other person, had used a cell phone to obtain a firearm, had communicated with anyone about firearms using cell phones or the Internet, was a member of any gangs, had engaged in gang-related activity, or had engaged in any kind of coordinated activity with another person relating to firearms.

Further, the iPhone Warrants sought evidence for "any other associated violence" since Armstrong's release in 2021.  (Gov't Ex. 1 at 2; Gov't Ex. 2 at 2.)  But there is no description of "any other associated violence" in the Affidavits, nor is there anything connecting any particular violent incident to Armstrong.  It appears that Sergeant Johnson had specific violent incidents in mind and reason to think they were connected to Armstrong when drafting the Affidavits, but none of that is contained in the Affidavits. Under these circumstances, the Court find the Affidavits did not establish a sufficient nexus between the iPhones and evidence of Armstrong's knowing possession of a firearm and "any other associated violence," and that the Affidavits did not establish probable cause.

The Court addresses the *Leon* exception in Section II.B.5.

### 3.      The iPhone Warrants Are Overbroad

Armstrong also seeks suppression on the ground that the iPhone Warrants fail to particularize the items to be searched and/or were overbroad.  (Dkt. 25 at 2-3; Dkt. 31 at

9-10; Dkt. 51 at 4, 6-7; Dkt. 53 at 2-3.)  The Fourth Amendment provides that "no

Warrants shall issue . . . [unless] **particularly describing** the place to be searched, and

the persons or things to be seized. U.S. Const. amend. IV (emphasis added).  The Fourth

Amendment's particularity requirement avoids "a general, exploratory rummaging in a

person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citing *Coolidge*

*v. New Hampshire*, 403 U.S. 443, 467 (1971)).  This particularity requirement applies to

the person suspected of the offense and the persons or things to be seized.  *United States*

*v. Grubbs*, 547 U.S. 90, 96 (2006).

Particularity and overbreadth are two distinct concepts.  *United States v. Moulder*,

Crim. No. 20-232 (JRT/BRT), 2022 WL 3644893, at *3 n.2 (D. Minn. Aug. 24, 2022).

"Particularity is the requirement that a warrant must state what is sought clearly and

breadth deals with the requirement that the scope of the warrant must be supported by

probable cause.  But it is also true that the Fourth Amendment guards against the use of

'general warrants,' or warrants so broad they allow for a "general rummaging in a

person's belongings." *Id.* (citing *Coolidge*, 403 U.S. at 467).  "A warrant, must therefore,

include a particular description of the things to be seized."  Courts have treated these

concepts as "intertwined," and this Court will do the same and analyze the issues

together.  *See id.*  The Court understands, however, that Armstrong's primary challenge is

to the breadth of the warrant

Courts judge compliance with the particularity requirement according to "a

standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*,

640 F.3d 338, 346 (8th Cir. 2011) (internal quotation marks omitted).  "The Fourth

Amendment requires that a search warrant's description of the evidence to be seized be sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized." *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (cleaned up).  How specific a warrant must be varies "depending on the circumstances and the type of items involved." *Frederickson*, 846 F.3d at 519 (cleaned up).  As such, courts do not resolve issues concerning particularity "in a vacuum.  The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Fiorito*, 640 F.3d at 346 (cleaned up).

Armstrong argues that the Search Warrants and supporting materials fail to adequately particularize the "scope of the search, instead seeking broad, indiscriminate access to the vast trove of data" on the iPhones.  (Dkt. 51 at 6-7; Dkt. 53 at 2-3.)  The Government argued in its brief filed after the March 8 Hearing that "[t]he totality of the circumstances set forth in the affidavits shows that the affiant limited the information sought specifically to evidence related to the defendant's possession of the fully automatic firearm (Dkt. 36 at 10), and did not respond to Armstrong's particularity/ overbreadth argument in its brief filed after the June 29 Hearing.

Citing the undersigned's Report and Recommendation in *United States v. Jackson*, Case No. 18-cr-211 (JNE/ECW), 2019 WL 13127190 (D. Minn. Jan. 4, 2019), Armstrong argues in his reply filed after the June 29 Hearing that the iPhone Warrants are "overly broad because they 'do not limit the files for which the cell phones are to be

searched and which are to be seized.'" (Dkt. 52 at 2 (cleaned up).) In *Jackson*, the warrant for the defendant's cell phone authorized the police to search for and seize "any and all files including but not limited to records, notes, names, telephone numbers, photographs, videos, text messages, call log information regarding specific communication [sic] to and from the telephone that are electronically stored in the telephone[]." 2019 WL 13127190, at *3. The files to be searched and seized were not described as those constituting "evidence of conduct that would give rise to the crime of felon in possession of a firearm, or indeed, any crime." *Id.* at *10. The undersigned concluded:

> This unfettered cell phone warrant is analogous to the warrant in *In re Grand Jury Proceedings*, where the Eighth Circuit found a warrant "authoriz[ing] the FBI to seize all records pertaining to [the party's] bail bonding business for the period January 1, 1976, to the present" to be overly broad. 716 F.2d 493, 497-99 (8th Cir. 1983). As the Eighth Circuit explained: "The scope of the search was otherwise unlimited: the warrant did not indicate that the documents sought pertained to any specific transactions, did not identify the offenses on which evidence was sought, and did not confine the search to any particular files or categories of documents." *Id.* at 497. Thus, this warrant is distinguishable from the warrant in *Fiorito*, which sought "[e]ntire files involving [Fiorito]" where Fiorito was alleged to have engaged in "an ongoing, well-defined equity-stripping scheme" and the broad phrase was followed by "an extensive list of specific documents." 640 F.3d 346-47 (alterations in original). It is also distinguishable from the warrant in *United States v. Kilman*, where the warrant sought "any and all data related to the crime of Criminal Sexual Conduct contained within the seized cellular phone." No. 16-cr-160 (MJD/LIB), 2016 WL 6134546, at *3 (D. Minn. Sept. 6, 2016), *R&R adopted* 2016 WL 6134512 (D. Minn. Oct. 20, 2016). Here, the cell phone warrant places no constraints on the files to be searched for or seized, and thus constitutes an impermissible "blanket search of documents for no particular purpose." *See Fiorito*, 640 F.3d at 346-47.

2019 WL 13127190, at *10.

Here, the Search Warrant portions of the iPhone Warrants define "the following described device(s)" as the particular iPhone and define the "following described property and thing(s)" as:

-account or subscriber information and contact lists

-texts and call logs, both via SMS messages or via mobile text applications contained on the phone

-video, photos and other media

-social media, email and communications via applications on the phone.

(Gov't Ex 1 at 5; Gov't Ex. 2 at 5.)  The Search Warrants further limited the "property and thing(s)" as follows: "Time or date stamped data shall be limited to those on or after 6/10/2021."  (Gov't Ex 1 at 5; Gov't Ex. 2 at 5.)  The Search Warrants then authorize law enforcement "to search the above-described device(s), for the described property and thing(s), and to seize and keep said property and thing(s) in custody until dealt with according to law."  (Gov't Ex. 1 at 7; Gov't Ex. 2 at 7.)  While the Search Warrants state that the judge found probable cause to believe that the "property and things above-described constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime" (Gov't Ex. 1 at 6; Gov't Ex. 2 at 6), the crime is not specified in the Search Warrants, nor are the property and things to be searched for, seized, and kept limited to that constituting evidence of a crime or who committed it, much less any particular crime.

In *Jackson*, the undersigned also considered whether the affidavit submitted in support of the warrant application limited the scope of items to be searched for and

seized.  2019 WL 13127190, at *11.  The Court does the same here.  "'The traditional rule is that the generality of a warrant cannot be cured by the specificity of the affidavit which supports it because, due to the fundamental distinction between the two, the affidavit is neither part of the warrant nor available for defining the scope of the warrant.'"  *Curry*, 911 F.2d at 76-77 (quoting *United States v. Gill*, 623 F.2d 540, 543 (8th Cir. 1980)).  The Eighth Circuit has held that "the generality of a warrant cannot be cured by the specificity of the affidavit which supports it" unless a two-part standard is met.  *Id.* (quoting *Gill*, 623 F.2d at 543).  "[A] description in the supporting affidavit can supply the requisite particularity if a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein."  *Id.* at 78 (cleaned up).

Here, as in *Jackson*, the second prong of the *Curry* test is not met because the Search Warrants contain no "suitable words of reference which incorporate the affidavit," such as "see attached affidavit" or "as described in the affidavit."[10]  2019 WL 13127190, at *11 (citing *Curry*, 911 F.2d at 78).  The only reference to the Affidavits in the Search Warrants is the statement "WHEREAS, the application of Jaclyn Tuma was duly presented and read by the Court, and being fully advised of the premises."  (Gov't Ex. 1

---

[10]     U.S. District Judge Joan N. Ericksen adopted the undersigned's Report and Recommendation in *Jackson*.  2019 WL 13127184 (D. Minn. Feb. 26, 2019).  The Government did not object to the "recommendation that the fruits of the search of the defendant's telephone be suppressed on the ground the affiant failed to incorporate his affidavit by reference so as to limit the scope of the search"; instead, "[t]he error ha[d] been brought to the officer's attention in the hope that it will not be repeated."  *See United States v. Jackson*, 18-cr-211 (JNE/ECW), Dkt. 49 at 6 n.3 (Feb. 8, 2019).

at 5; Gov't Ex. 2 at 5.)  The Eighth Circuit has previously found that such language does

not constitute incorporation of an affidavit into a warrant.  *See, e.g.*, *Curry*, 911 F.2d at

78.  Accordingly, the Government cannot rely on the application to overcome the facial

overbreadth of the warrant itself.  *See id.* at 77-78; *see also United States v. Thomas*, 263

F.3d 805, 808 (8th Cir. 2001) ("Officer Harris' affidavit in support of his request for the

warrant contained the correct address and a specific physical description of the target

premises, but it was not incorporated into the warrant with suitable words of reference.

Therefore, the affidavit did not cure the defective warrant.").  Thus, while the Affidavits

indicate that the iPhone Warrants seek evidence of weapons possession and "any other

associated violence" (Gov't Ex. 1 at 2; Gov't Ex. 2 at 2), those statements cannot cure the

Search Warrants themselves.

To be clear, the Court does not find the iPhone Warrants overbroad because they

permit a search through the described files (text and call logs, video, photos, etc.); the

Court finds the iPhone Warrants overbroad because the property and things to be

searched for, seized, and kept are not limited to those constituting evidence of a crime,

much less evidence of Armstrong's knowing possession of a firearm.  *See United States*

*v. Holmes*, Case No. 20-cr-221 (ECT/HB), 2021 WL 4812996, at *4-5 (D. Minn. July 19,

2021) (finding that although the warrant did not describe the information to be seized in a

specific manner, it contained other limitations, including that "the information to be

seized had to constitute 'evidence of violations of 18 U.S.C §§ 912 and 1343 and related

offenses . . .'"), *R. & R. adopted*, 2021 WL 4146385 (D. Minn. Sept. 13, 2021); *see also*

*United States v. Olaya*, 2017 WL 1967500, at *3 (E.D. Mich. April 19, 2017) (explaining

that "a warrant permitting officers to look at every aspect of a cell phone does present substantial constitutional concerns," but because criminals take measures to conceal criminal activity, the warrant was rendered reasonable by the affidavit incorporated by the warrant because it indicated the search was for evidence of robbery).  As explained above, the Affidavits were not incorporated into the Search Warrants, and there is no other language in the Search Warrants themselves limiting the evidence to be searched for, seized, and kept.

### 4.      The iPhone Warrants Are Not Severable

The Eighth Circuit has found that a warrant that is overly broad or insufficiently particular "only in part" is severable, and "items seized pursuant to valid portions of the warrant need not be suppressed."  *United States v. Timley*, 443 F.3d 615, 622 (8th Cir. 2006) (particularity); *United States v. Coleman*, 909 F.3d 925, 931 (8th Cir. 2018) (overbreadth).  "Nevertheless, severance is not always possible.  If no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required."  *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982).  Typically, courts analyze severance when several categories of items to be seized are listed, only some of which are overly broad or insufficiently particular.  *See, e.g.*, *Timley*, 443 F.3d at 623 (severing "indicia of occupancy" from "sufficiently particular" categories of marijuana, weapons, and currency); *United States v. Mims*, 567 F. Supp. 2d 1059, 1071-72 (D. Minn. 2008) (severing "insufficiently particular" category of "computer hard drives and disks and the stored data" from "receipts, invoices, notes, journals, ledgers,

and other documents) [that] were specific as to their relationship with controlled substances, firearms, or other possible illegal activities").

"[S]everance is not always possible. If no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required." *Cardwell*, 680 F.2d at 78.  The parties did not address the question of severability in the briefing, and indeed, the Court is unable to identify any "portion" that may be severed.

    **5.**    ***Leon***

The Court next addresses the parties' *Leon* arguments as they relate to probable cause and particularity/overbreadth.

The Government argues that *Leon* applies with respect to Armstrong's nexus/ probable cause argument because the executing officers relied in good faith on search warrants signed by a neutral and detached judge and the officers' reliance on the Warrants was objectively reasonable.  (Dkt. 36 at 11; Dkt. 52 at 8-10.)  The Government also argues that none of the *Leon* exceptions apply.  (Dkt. 36 at 12; Dkt. 52 at 8-10.)  The Court understands Armstrong to be arguing that *Leon* does not apply because the Affidavits are so lacking in indicia of probable cause as to render official belief in their existence entirely unreasonable and that the Search Warrants are so facially deficient that no police officer could reasonably presume them to be valid.  (Dkt. 51 at 7-16; Dkt. 53 at 3-10.)

A court can "look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit" when determining whether the *Leon* good faith exception applies.  *United*

*States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (cleaned up).  At the June 29 Hearing,

Sergeant Johnson testified extensively about her professional background and experience

with gangs, her prior knowledge of Armstrong through her gang documentation work in

2016, including that he was a member of the SUB, and that she worked on a shooting-

related case brought against Armstrong in 2019.  (*Id.* at 15:8-17:1-13, 18:22-19:2, 19:11-

22:7, 27:10-29:1, 30:3-36:12, 46:17-47:15, 51:22-52:5.)  She also testified that before she

sought the iPhone Warrants, law enforcement had established that the phone number

provided by the CI/CS belonged to Armstrong's girlfriend, as did the red Jeep referenced

by the CI/CS.  (*Id.* at 37:19-39:3.)  Sergeant Johnson testified that based on her training

and experience, it is common for gang members to have access to firearms, and it is

"incredibly common" for gang members to have photos of guns, drugs, and other gang-

related items on their cell phones.  (*Id.* at 40:4-41:7.)  Sergeant Johnson testified that the

Search Warrants were executed when she delivered them, along with iPhone #1 and

iPhone #2, to the MPD crime lab's forensic computer division to conduct extractions.

(*Id.* at 52:15-25.)

The Court addresses Armstrong's argument that the use of the word "might" in

connection with the types of evidence sought (the persons Armstrong was

communicating with about the firearm and its modification, associated violence, and

where the iPhones were at the "times of incidents being investigated") demonstrates the

lack of probable cause.  The Court declines to conclude—particularly in the context of

*Leon*—that this wording means Sergeant Johnson did not even believe there was a "fair

probability" that such evidence would be found.  Armstrong cites no case where use of

the word "might" in an affidavit weighed against a finding of probable cause, and drawing this conclusion would contravene the Eighth Circuit's injunction that "The affidavit should be examined under a common sense approach and not in a hypertechnical fashion." *Solomon*, 432 F.3d at 827 (cleaned up).

Armstrong also argues that the Tracking Warrant does not "save" the iPhone Warrants from the exclusionary rule because the Tracking Warrant was based on "stale, incomplete investigations" acquired by Sergeant Johnson when investigating Armstrong three to eight years ago, contained vague generalities and assumptions, and that the information provided by the person described as a CI in the iPhone Warrants and as a CS in the Tracking Warrant was secondhand. (Dkt. 51 at 9-16; *see also* Gov't Ex. 1 at 2 (using "CI"); Gov't Ex. 2 at 2 (using "CI"); Gov't Ex. 3 at 4 (using "CS")). Armstrong contends that Sergeant Johnson had no experience working with CIs or CSs and only "very loosely" understood the distinction between a CI and CS, that the reliability of the CI/CS was unknown, and that in any event, the CI provided information about only one of the cell phones. (Dkt. 51 at 9-10.) The Court finds these arguments unpersuasive.

The Affidavits stated that Armstrong had pleaded guilty to an Assault 2 shooting in 2019, that he was placed on supervised release in June 2021, and that a CI had stated that Armstrong had a gun and provided a current phone number for Armstrong for which Sergeant Johnson had previously obtained the Tracking Warrant for "in hopes of aiding in his location and arrest." (Gov't Ex. 1 at 2; Gov't Ex. 2 at 2.) Further, in the affidavit supporting her application for the Tracking Warrant, Sergeant Johnson averred that Armstrong "is a documented member of the SUB (Stick up Boyz), a criminal street gang

37

known for violent crime and weapons possession in the Twin Cities Metropolitan area[]"
and that in the 72 hours preceding her application, Sergeant Johnson reviewed a call the
"CS" placed to the phone number for which she sought the Tracking Warrant and that the
"CS" began the call by stating "'Kease? to which a male voice responds 'Ya. What's up
bro?'"  (Gov't Ex. 3 at 3-4.)

       In addition, Sergeant Johnson testified that in October 2021, she had downloaded
videos posted in August 2021 where Armstrong talked about weapons possession,
wanting to make guns fully automatic, and using a sear to do so, as well as "very
explicitly talk[ing] about participating in a shooting and the process by which a shooting
is committed."  (Dkt. 49 at 34:23-36:12.)  Sergeant Johnson testified about the
verification of the phone number provided by the CI/CS, namely that it was answered by
a person who responded in the affirmative when asked if he was "Kease"; that in her
experience, the SUB have "shown a pattern of violence that is often associated with gun
possession"; that based on her training and experience, it is common for SUB gang
members to have access to firearms; and that based on her training and experience, "it is
incredibly common for . . . gang members themselves to have photos of guns or drugs or
any of the kind of common tools of the trade for - - for gang membership" on their cell
phones. (*Id.* at 27:12-25, 38:12-19; 40:4-41:7.)  She also testified that when an ATF agent
approached her about investigating Armstrong based on the CI/CS's information:

       Because of my previous involvement with investigations in which Mr.
       Armstrong was a subject of them, I knew that he had a very well-documented
       history of gun possession and associated violence with those guns. But then
       also I noted at the time that there was several high-profile murders and
       shootings that involved people of -- that were documented as being in the

same gang. Thus, I thought that it would be worth looking into and at the time that it would likely be a fruitful investigation.

(*Id.* at 23:1-9.)

The Government inquired into the relationship between Armstrong and those

incidents:

> Q.     These murders and shootings that you're referring to, did you have reason to believe that any of them -- and I'm going to say "associated" but I don't mean that Mr. Armstrong did them -- but that he was aware of them or that there were associates of some people that he had involvement or knowledge with?
>
> A.     Yes, I do believe that's true.

(*Id.* at 23:10-16.)

When asked about the connection between Armstrong and the "murders and

shootings," Sergeant Johnson responded:

> In my experience when people of a specific group, even not necessarily the person themselves but their friends and their associates are the victims of violence, they are often put in the position of heightened awareness, heightened need in their -- in their view, to carry guns and to protect themselves, even for their own self-protection.
>
> When we see trends of violence, it is not just that – there's a back and forth, and so when someone and their friends are targeted by violence, we see an increase in not only their perpetration of violence but also them being the victims of that violence as well.
>
> So seeing that people that are associated with Mr. Armstrong were the victims of that violence, it would be a -- I would say it would be a reasonable conclusion that there would be an increased likelihood of violence associated around them.

(*Id.* at 24:18-25:8.)

The Court first considers Armstrong's arguments as to the CI/CS. "Information [provided by a CI] may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *United States v. Morales*, 238 F.3d 952, 953 (8th Cir. 2001) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). In determining whether the informant's tip has been corroborated, even innocent activity can provide sufficient support. *See United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (citation omitted). Moreover, not every detail must be corroborated. *See Gladney*, 48 F.3d at 313 ("When an informant's information is at least partly corroborated . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.") (cleaned up).

Here, the phone number provided by the CI/CS was corroborated in the Affidavits by the fact that Armstrong was located in the apartment building identified through the Tracking Warrant, by the links between the red Jeep and apartment building through Armstrong's girlfriend, and the assertion by the CI/CS that Armstrong had a gun was corroborated by the validity of the phone number (verified by the call to the number described in the affidavit in support of the Tracking Warrant) and at least partially by the fact that a firearm was found in a large tuft of grass that Armstrong fell into while fleeing. (Gov't Ex. 1 at 2; Gov't Ex. 2 at 2.) The Court finds that the CI/CS's information was sufficiently corroborated.

The Court also considers Armstrong's argument that Sergeant Johnson's information was based on stale, incomplete investigations and based on generalities and

assumptions.  In view of Sergeant Johnson's detailed testimony about her experience with gangs and specific knowledge of Armstrong, and her explanation of why she thought there would be violence "associated with" (if not committed by) Armstrong, which includes information obtained after Armstrong's release in 2021, the Court rejects this argument.

In sum, at the time Sergeant Johnson sought the iPhone Warrants, she knew that the CI/CS had provided a phone number that was successfully used to locate Armstrong where the location and phone were both linked to Armstrong's girlfriend; Armstrong had been a member of the SUB, "a criminal street gang known for violent crime and weapons possession"; the CI/CS had provided information regarding Armstrong's possession of a firearm on several occasions; in August 20121, there were videos of Armstrong on social media talking about weapons, making firearms automatic, and participating in a shooting; Armstrong had fled from the police when arrested while leaving his girlfriend's apartment[11]; and a firearm was found in a tuft of grass into which Armstrong had tumbled when fleeing.  She also knew that it was "incredibly common" for gang members to have photos of themselves with guns.  Finally, she knew that the judge who signed the iPhone Warrants had also signed the Tracking Warrants.  Based on all of this information, the Court concludes that, with respect to nexus/probable cause as it relates to *Leon*, the

---

[11]    Fleeing from law enforcement can be considered as part of the probable cause analysis.  *See United States v. Clark*, 743 F.2d 1255, 1260 (8th Cir. 1984); *see also United States v. Desjarlais*, No. 20-CR-40 (MJD/LIB), 2020 WL 5996449, at *7 (D. Minn. Sept. 2, 2020) (flight from vehicle after traffic stop bolstered probable cause to determine that firearm was likely evidence of a recent shooting), *R. & R. adopted*, No. CV 20-40 (MJD/LIB), 2020 WL 13112147 (D. Minn. Oct. 7, 2020).

Affidavits were not so lacking in indicia of probable cause as to render official belief in their existence entirely unreasonable. *See Stevens*, 530 F.3d at 718 (stating probable cause "exists when a 'practical, common-sense' inquiry that considers the totality of the circumstances set forth in the information before the issuing judge yields a 'fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *Gates*, 462 U.S. at 238).

The Court turns to the issue of whether the Search Warrants are so facially deficient that no police officer could reasonably presume them to be valid. "In assessing whether reliance on a search warrant was objectively reasonable under the totality of the circumstances, it is appropriate to take into account the knowledge that an officer in the searching officer's position would have possessed." *See Curry*, 911 F.2d at 78. Several courts have found, at least in the Facebook context, that the *Leon* exception applies where the affiant executed the warrants and personally reviewed the material. *See, e.g.*, *United States v. Markwald*, Crim. No. 21-21 (ECT/BRT), 2021 WL 6808303, at *9 (D. Minn. Nov. 4, 2021) (finding the good-faith exception applicable to the search of defendant's Facebook accounts in part because the affiant "not only drafted both the applications and search warrants, but he was also the officer that directed the entire investigation, executed each warrant, and personally reviewed the material received from Facebook," which was "significant"), *R. & R. adopted*, 2022 WL 43306 (D. Minn. Jan. 5, 2022); *Olaya*, 2017 WL 1967500, at *4 (applying the good-faith exception because the warrant incorporated the affidavit by reference, the affidavit stated the pertinent criminal violations at issue, and the affiant averred that he "kn[e]w[] and believe[d]" evidence of defendant's

42

involvement in the commission of aggravated robbery would be found on the phone to be searched); *United States v. Harris*, No. 20-CR-98 (SRN/TNL), 2021 WL 3929270, at *4 (D. Minn. Sept. 2, 2021) ("As in *Curry*, Officer Lokhorst drafted the application and search warrant, and after he obtained the Facebook search warrant and received the requested materials, he analyzed them. Officer Lokhorst knew that the scope of his subsequent analysis was for 'information about the firearm recovered from [Defendant's] vehicle,' which might assist investigators in proving the ownership or possession of the gun. Thus, he was 'fully aware of the purpose and parameters of the investigation,' and there is no evidence here to suggest that he failed to act in good faith, or that his analysis was somehow skewed by the warrant's failure to refer to gun-specific evidence.") (cleaned up).

Here, however, the only evidence as to the Search Warrants' execution is that Sergeant Johnson:

> took the cell phones themselves and the warrants themselves and actually walked them up one flight of stairs to our crime lab's forensic computer division and actually submitted them to the people who are trained to do the extractions. I gave them to them myself.

(Dkt. 49 at 52:16-25.)

There is nothing in the record establishing whether the Affidavits were provided to the people who did the extractions or whether Sergeant Johnson or some other person searched the results of the extractions (and what they searched for). The undersigned has previously recommended suppression under these circumstances. *See Jackson*, 2019 WL 13127190, at *12 ("However, while the receipt attached to the warrant indicates [the

affiant] collected the cell phone 'to be examined at a later date[,]' there is no evidence as to who actually searched the cell phone and whether that person had the application as well as the warrant or otherwise understood the intended scope of the search.  In view of the breadth of the warrant itself and the absence of any evidence or argument regarding whether the application was attached to the warrant, who executed the search, or the knowledge of the executing officer, the Court cannot find the application of the *Leon* exception appropriate based on the current record.  Consequently, the Court recommends suppression of the results of the cell phone search.") (citations omitted).

In considering this issue again, the Court recognizes the purposes behind the *Leon* doctrine.  As the U.S. Supreme Court has explained:

> When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, or when their conduct involves only simple, "isolated" negligence, the "deterrence rationale loses much of its force," and exclusion cannot "pay its way[.]"

*Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009); *Leon*, 468 U.S. at 909).

The Court also recognizes two additional principles set forth by the Supreme Court: first, that the particularity/overbreadth doctrine is intended to preclude "the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings," *see Coolidge*, 403 U.S. at 467, *holding modified by Horton v. California*, 496 U.S. 128 (1990), and second, that "a cell phone search would typically expose to the government far *more* than the

44

most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is," *Riley*, 573 U.S. at 396-97.  In view of these principles, the Court concludes that no law enforcement should reasonably believe that they could search for, seize, and keep the unrestricted sets of files sought by the Search Warrants (which were not limited to evidence of any particular crime).  There is no evidence in the record establishing that the Affidavits cured the Search Warrants' facial overbreadth.  For these reasons, the Court concludes that *Leon* does not apply to the iPhone Warrants insofar as they were insufficiently particular and overbroad, and recommends suppression of the evidence obtained from the iPhone Warrants.

**C.    Motion to Compel**

The parties disagree as to the scope and timing for the disclosure of the Government's witness impeachment materials.  Armstrong takes the position that the Government must disclose any witness impeachment material in accordance with *Brady*, *supra*, and asks the Court to order production of materials that fall within the *Brady* rule, including "any and all *Giglio* material" that is considered "material" before trial.  (Dkt. 51 at 17-19; Dkt. 53 at 11-14.)  Armstrong contends that non-exculpatory impeachment materials of potential government witnesses constitute *Brady* materials.  (Dkt. 51 at 17-18.)

The Government responds that non-exculpatory impeachment materials do not constitute *Brady* material, and that disclosing such information would force it to

"prematurely reveal its witness list to the defense, in contravention to Rule 16."  (Dkt. 36 at 13-17.)  The Government also contends that a requirement that it disclose *Giglio* non-exculpatory impeachment materials at the same time as it discloses exculpatory *Brady* materials is not supported by law, will be unworkable and impracticable, and is premature, and proposes to disclose such non-exculpatory impeachment materials in a "reasonably timely manner before trial."  (Dkt. 52 at 10-19.)  The Government represents that it "would not object to an Order consistent with that adopted by the district court in" *United States v. Begay*, Case No. 21-cr-119 (NEB/LIB), 2022 WL 1110195, at *3 (D. Minn. Jan. 6, 2022).

"In *Brady*, the Supreme Court held that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Villasana v. Wilhoit*, 368 F.3d 976, 978 (8th Cir. 2004) (citing *Brady*, 373 U.S. at 87).  "Materially favorable evidence includes both exculpatory and impeachment evidence." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  The duty imposed by *Brady* applies only to "favorable evidence rising to a material level of importance[]" and is "limited to evidence a reasonable prosecutor would perceive at the time as being material and favorable to the defense." *Id.* at 979 (citations omitted). "Prosecutors commit a *Brady* violation when they withhold evidence from the defense that is (1) favorable to the accused and (2) material either to guilt or to punishment." *United States v. Corey*, 36 F.4th 819, 822 (8th Cir. 2022).  The Eighth Circuit has held that "*Brady* does not require pretrial disclosure, and due process is satisfied if the

information is furnished before it is too late for the defendant to use it at trial." *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005). "*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Miller*, 698 F.3d 699, 704 (8th Cir. 2012) (quoting *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985)).

The parties' arguments implicate the interplay between *Brady*, *Giglio*, and the Jencks Act. (*See* Dkt. 31 at 12-13; Dkt. 36 at 13-17; Dkt. 41 at 10-11; Dkt. 51 at 16-19; Dkt. 52 at 12-19; Dkt. 53 at 11-14.) The Jencks Act provides that: "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). The Eighth Circuit has held that a court may not order the Government to make its Jencks Act disclosures before the witness testifies. *See, e.g.*, *United States v. White*, 750 F.2d 726, 729 (8th Cir. 1984).

As stated above, the Court has previously ordered disclosure of "all information that would tend to exculpate Defendant or reduce the penalty in its possession or of which it has become aware as of today's date on or before **July 11, 2022** if that information has not been disclosed" and that the Government "must promptly supplement its disclosure upon receipt of any such additional information." (Dkt. 46.) The Government did not object to this Order. (Dkt. 49 at 5:6-13, 6:4-18.)

*Brady* and *Giglio* both require the production of evidence "favorable" to the Defendant and both *Brady* and *Giglio* "stand[] on equal Constitutional footing, and [are] not distinguished in that regard," but "there is an important procedural and conceptual difference which attaches to the two types of 'favorable-to-the-defendant' evidence." *United States v. Hopkins*, Cr. No. S-05-0538 EJG (GGH), 2008 WL 4453583, at *2 (E.D. Cal. Oct. 3, 2008) (citation omitted). First, *Brady* "relates to evidence which directly tends to lessen a defendant's guilt, e.g., a statement from another person which tends to relieve the defendant of responsibility for the crime," whereas, *Giglio* relates to "*witness credibility* type evidence of a *collateral nature*, e.g., evidence that the government's witness who is implicating the defendant is not to be trusted in his implications because of bias, previous misrepresentations in similar matters, and so forth, i.e., indirectly making it less likely that the defendant is guilty." *Id.*

Second, as to timing, *"Brady* evidence is to be disclosed to the defense at a time such that the defendant is able to put the evidence to meaningful use, i.e., perform the necessary investigation and follow-up," but "*Giglio* evidence need not be disclosed until a witness testifies: 'since information concerning favors or deals merely goes to the credibility of the witness, it need not be disclosed prior to the witness' testifying." *Id.* (citations omitted) (cleaned up). This important distinction is finely highlighted by U.S. Magistrate Judge Leo I. Brisbois in *Begay*, where he ordered the Government to disclose all *Brady* materials to the defendant "as soon as said responsive materials are discovered by the Government" and separately ordered the Government to "disclose materials which are responsive to <u>Giglio</u> and related to the impeachment of the Government's witnesses

to be called at trial no later than seven (7) days before trial, or when ordered by the trial

judge to disclose trial witnesses, whichever is earlier."  2022 WL 1110195 at *3 (finding

that not only does the Government have an obligation to disclose exculpatory evidence

but it is also obligated to disclose evidence that "might be valuable in impeaching

government witness.  'However, this obligation only applies to testifying officers.'")

(quotations and citations omitted) (collecting cases), *R. & R. adopted*, 2022 WL 683090

(D. Minn. March 8, 2022); *see also United States v. Haskell*, 468 F.3d 1064, 1076 (8th

Cir. 2006) ("As the district court correctly noted in denying Haskell's motion, Hunter's

complaints about Porter bothering him may have been useful to impeach Porter, had he

testified at trial.  However, Porter did not testify.  Therefore, the evidence is not material

because the government's case would have been the same even had the defense had

access to the undisclosed information.  Because the evidence was not material, Haskell's

motion for a new trial was correctly denied."); *United States v. Presser*, 844 F.2d 1275,

1282-83 (6th Cir. 1988) (finding that neither *Giglio* nor *Bagley* "gives the defense a

general right to pre-trial discovery of evidence impeaching defense witnesses, where the

prosecution denies that any such material is exculpatory and material under *Brady*.  If

impeachment evidence is within the ambits of the Jencks Act, then the express provisions

of the Jencks Act control discovery of that kind of evidence.").

   Based on the above, and given the Government's statement that it would not

object to an order consistent with that adopted in *Begay*, no later than seven (7) days

before trial, or when ordered by the trial judge to disclose trial witnesses, whichever is

earlier, the Government shall disclose materials that are responsive to *Giglio* and related to the impeachment of the Government's witnesses to be called at trial.

### III.   ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:  Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant (Dkt. 20) is **GRANTED** insofar to the extent any materials are responsive to *Giglio* and related to the impeachment of the Government's witnesses to be called at trial, the Government shall produce such information no later than seven (7) days before trial, or when ordered by the trial judge to disclose trial witnesses, whichever is earlier, and is otherwise **DENIED**.

### IV.   RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT**:  Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 25) be **GRANTED**.


DATED: September 2, 2022                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

**<u>NOTICE</u>**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).