```
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
      --------------------------------------------------------
 3                                    )
      United States of America,       )   File No. 21-cr-228
 4                                    )            (DWF-ECW)
              Plaintiffs,             )
 5                                    )   TESTIMONY OF
      vs.                             )   LT. JEFFREY WAITE
 6                                    )   Courtroom 7C
      Marques Dwell Armstrong, Jr.,   )   St. Paul, Minnesota
 7                                    )   February 14, 2023
                                      )   1:30 p.m.
 8            Defendant.              )
      --------------------------------------------------------
 9
                 BEFORE THE HONORABLE DONOVAN W. FRANK
10                UNITED STATES DISTRICT COURT JUDGE
                              (TRIAL)
11
      APPEARANCES:
12    For the Plaintiff:          United States Attorney's Office
                                  Benjamin Bejar, AUSA
13                                Albania Concepcion, AUSA
                                  300 South 4th Street
14                                Suite 600
                                  Minneapolis, Minnesota 55415
15
      For the Defendant:          Office of the Federal Defender
16                                Manny Atwal, ESQ.
                                  300 South Fourth Street
17                                Suite 107 US Courthouse
                                  Mpls, MN  55415
18
      Court Reporter:             Lynne M. Krenz, RMR, CRR, CRC
19                                Suite 146
                                  316 North Robert Street
20                                St. Paul, Minnesota 55101
21
22
23
           Proceedings reported by certified stenographer;
24    transcript produced with computer.
25
```

1                              **I N D E X**

2
                                                                PAGE
3
     **JEFFREY WAITE**
4        Direct Examination By Mr. Bejar                          4
         Cross-Examination By Ms. Atwal                          28
5        Redirect Examination By Mr. Bejar                       32

6

7

8

9    GOVERNMENT'S EXHIBITS                                    REC'D
            12                                                   23
10          13                                                   23
            14                                                   23
11          15                                                   25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2                           **IN OPEN COURT**

3                          **(JURY PRESENT)**

4              THE COURT:  As soon as the jury's ready, counsel,

5     you may proceed with your next witness.

6              MR. BEJAR:  Thank you, Your Honor.  Bless you.

7              The United States called Lieutenant Jeffrey Waite.

8              THE COURT:  If you want to step to the front of

9     the courtroom, sir.

10             And then before you step into what we call a

11    witness box, if you'd would please raise your right hand.

12             Do you swear the testimony you shall give relative

13    to this case now under consideration shall be the truth and

14    nothing but the truth, so help you God?

15             THE WITNESS:  I do, Your Honor.

16             THE COURT:  And there's a couple steps up there.

17             And then as I tell every witness, between moving

18    the chair once you sit down and the microphone, you'll have

19    to speak quite close into the mic because that slides too,

20    otherwise everyone can't hear you.

21             If you would please then state your full name and

22    spell your last name.

23             THE WITNESS:  It's Jeffrey Waite.  Last name is

24    W-A-I-T-E.

25             THE COURT:  You may inquire, counsel.

1         MR. BEJAR:  Thank you, Your Honor.

2                   **(Jeffrey Waite)**

3                 **DIRECT EXAMINATION**

4    BY MR. BEJAR:

5    Q.  Good afternoon, Lieutenant Waite.  How are you employed?

6    A.  Good, how are you?

7    Q.  How are you employed?

8    A.  I'm sorry, I'm a lieutenant with the Minneapolis Police

9    Department.

10   Q.  How long have you been with the Minneapolis Police?

11   A.  I am in my 29th year.

12   Q.  Any particular unit with the MPD that you're currently

13   assigned?

14   A.  I'm currently in charge of the gun investigations unit

15   for Minneapolis.

16   Q.  And how long have you been with the gun investigations

17   unit?

18   A.  Since June of 2021, June or July.

19   Q.  And is that when you were promoted to lieutenant?

20   A.  Yes.

21   Q.  What does the gun investigations unit do generally?

22   A.  We investigate -- originally we investigated mainly just

23   gun crimes, either people who were arrested with a firearm

24   or shots that were heard in the area, that kind of gun

25   crime.

1          Since we've had the loss of so many officers in

2    Minneapolis we've taken on additional roles beyond that.

3    Q.  Were you with any other units of note during your career

4    with Minneapolis?

5    A.  Yes, I was.

6    Q.  And can you just tell us a few of those.

7    A.  I was -- I've been an investigator in a neighborhood

8    crime unit, I guess it's called -- we called them the CRT

9    team, it's Community Response Team.

10          I spent several years in our gang unit as a gang

11    investigator.

12          I was an investigator in the violent offender task

13    force, which was a multi-agency task force for gang, gun,

14    drugs, that type of crime.

15          I got promoted.  I was a street sergeant for about

16    four years then I was in charge -- I was a supervisor at a

17    federally run task force called the Safe Streets Task Force,

18    which was the FBI in Minneapolis/St. Paul, the BCA, once

19    again a gang, and gun, and drug task force.

20          And I've also investigated robberies and gun

21    crimes and I think our property crimes unit would pretty

22    much cover it.

23    Q.  Okay.  Thank you.  And are you also currently still a

24    federal task force officer with the FBI?

25    A.  Yes, I am.

1    Q.  And generally what is a federal task force officer?

2    A.  They take a local police officer and you get deputized

3    by the U.S. Marshals to investigate federal offenses of

4    different crimes but in a federal court system versus a

5    state court system.

6    Q.  Got it.  I'd like to turn your attention now to the

7    morning of October 12th, 2021, and the events that occurred

8    around that time.  And do you have that date and time in

9    mind?

10   A.  I do.

11   Q.  Were you working that day, sir?

12   A.  Yes, I was.

13   Q.  And what were you doing?  What was your role and

14   responsibility that day?

15   A.  I was lieutenant in charge of the unit.  I had only been

16   there about four months.  There was a detail going on in

17   Roseville looking to arrest somebody on a federal warrant.

18           I went to assist, not only to help direct

19   everything that was going on, but I also hadn't done a lot

20   of work with the federal agents that are assigned to this

21   particular unit or to this particular detail so I wanted to

22   see kind of how they did things as well and how they

23   interacted with the Minneapolis people.

24   Q.  Who was the person you were driving to arrest?

25   A.  Marques Armstrong.

1    Q.  And is that the defendant who's here today?

2    A.  Yes, it is.

3    Q.  Were you set up in the area of ████████████ in

4    Roseville?

5    A.  Yes, I wasn't directly there, I was about a block away.

6    Q.  Okay.  And your main duty was for surveillance at that

7    point in time?

8    A.  Yes.

9            (Pause in proceedings)

10           MR. BEJAR:  Your Honor, if -- okay.  Thank you.

11   Appreciate that.

12   BY MR. BEJAR:

13   Q.  I'm showing you Government Exhibit 1; do you see that on

14   your monitor?

15   A.  Yes, I do.

16   Q.  This is a general area of the ████████████ where

17   this detail was taking place?

18   A.  Correct.

19   Q.  And are you able to show the jury on the map

20   approximately where you were located?

21   A.  Is it just touchscreen?

22   Q.  It is touchscreen.

23   A.  Okay.

24   Q.  So you should be able to --

25   A.  Right about there (indicating).

1    Q.  So you've put a red mark just to the north of the

2    intersection of Eldridge Avenue West and Fry Street to the

3    west of ▆▆▆; is that correct?

4    A.  That's correct.

5    Q.  And you were facing which way, sir?

6    A.  I was facing northbound, which would be up.

7    Q.  Okay.  And you were in a -- what type of vehicle were

8    you in?

9    A.  I was in an unmarked Jeep Grand Cherokee, gray.

10   Q.  Okay.  Was there a plan in place to arrest Mr. Armstrong

11   on the federal warrant?

12   A.  Yes, there was.

13   Q.  And what essentially was that plan?

14   A.  Officers were going to try to arrest him in the back, so

15   the north side or upper side of where the building that says

16   ▆▆▆.  So that was a -- it's like an extended parking lot

17   that runs all the way along here.

18   Q.  Okay.

19   A.  And they were going to arrest him back in that area.

20   Q.  And you've basically drawn a couple of lines to the

21   north of where it says ▆▆▆ in that back parking lot and

22   circled the area near ▆▆▆; correct?

23   A.  That's correct.

24   Q.  And, again, were you part of the arrest team or just

25   part of surveillance at that point in time?

1    A.  Surveillance.  And it was kind of outer surveillance.

2    In case somebody ran, I could set up kind of an area of --

3    to surround him.

4    Q.  How were you dressed?

5    A.  I was dressed just in regular clothes like blue jeans

6    and probably a long-sleeved shirt or sweatshirt, I'm not

7    sure that day.

8    Q.  Did you have any police insignia on?

9    A.  I did not.

10   Q.  Did you have a police vest with you?

11   A.  Yes, it was in the back of the car.

12   Q.  And did that police vest have a body-worn camera affixed

13   to it?

14   A.  It does.

15   Q.  But you weren't wearing it at the start of this detail;

16   is that correct?

17   A.  That's correct.

18   Q.  And why is that?

19   A.  I was trying not to be known as law enforcement as I was

20   sitting there.

21   Q.  Okay.  So around 10:00 a.m. in relation to the events on

22   October 12th, 2021, excuse me, what did you -- what

23   happened?

24   A.  I heard on the radio that he had come out of the back of

25   the building and they were going to effect the arrest.

1   Q.  And when you say he, who is that?

2   A.  Mr. Armstrong.

3   Q.  Okay.  And after you heard that they were going to

4   effect the arrest, what did you hear or see?  What happened

5   next?

6   A.  There was some commotion on the radio about him fleeing

7   in a vehicle and the next thing I saw was a -- the red Jeep

8   coming westbound on Eldridge out toward Fry, but it was

9   behind me, so it would have been over my right shoulder.

10  Q.  So, again, to orient the jury, why don't you put a

11  little -- maybe a box to show where your vehicle was and

12  then show the direction of travel of the Jeep that you

13  observed.

14  A.  (Indicating).

15  Q.  And then did it go south or north on Fry?

16  A.  Kind of neither.  It started to go south and it ended up

17  hitting a tree, roughly right here (indicating).

18  Q.  Okay.  But it's towards the south of Fry, correct?

19  A.  It started to make the turn southbound, yes.

20  Q.  Okay.  And you, again, are facing northbound; is that

21  right?

22  A.  Correct.

23  Q.  And how are you able to observe the Jeep coming out of

24  Eldridge and start to head south on Fry?

25  A.  It was right over my right shoulder.  So as it came, I

```
1    literally turned and watched it strike the tree right

2    through the back window of my car.

3    Q.  How far away are you from the intersection of Eldridge

4    and Fry there would you estimate?

5    A.  Here to the back of the room.

6    Q.  And what --

7    A.  About 50 feet-ish.

8    Q.  About 50 feet?  Okay.  Did you have a clear view of the

9    intersection of Eldridge and Fry?

10   A.  Yes, I did.

11   Q.  Okay.  So did you observe the Jeep actually coming out

12   of Eldridge and sort of going towards Fry?

13   A.  Yes.

14   Q.  And were you able to see whether, was it traveling,

15   slowly, fast, how was it traveling?

16   A.  It was a very high rate of speed.

17   Q.  Okay.  And I believe you testified you saw it lose

18   control; is that correct?

19   A.  Yes, as it started to make the corner it jumped up on

20   the curb and struck a tree and then bounced back into the

21   street.

22   Q.  Okay.  And was that -- where was it that it

23   approximately struck the tree on the map?

24   A.  Roughly right where I put the 'X.'

25   Q.  Okay.  So it's a little bit sort of near the
```

1    intersection of Fry and Eldridge, of the continuation of Fry

2    and Eldridge but more off of Fry; is that right?

3    A.  Yes, I guess you could say that.  I would call it

4    northwest corner, because Eldridge and Fry literally

5    intersect twice there if you look at the map.

6    Q.  Uh-huh.

7    A.  It would be the northwest corner of the southern edge of

8    Eldridge and Fry.

9    Q.  Very good.

10          After the Jeep, as you described, jumped the curb

11   and wrecked, what did you see next, sir?

12   A.  Mr. Armstrong immediately begin running out of the

13   vehicle.

14   Q.  And did you see him actually exit the vehicle?

15   A.  I saw him -- I don't recall which door was facing me,

16   but he got out of immediately where the vehicle was in the

17   middle of the street and began running.

18   Q.  Okay.  And what direction did you see the person that

19   came out of the Jeep run?

20   A.  I would call it southwest.  Do you want me to show on

21   the map?

22   Q.  Sure.

23   A.  In that direction (indicating) and then eventually that

24   direction (indicating).

25   Q.  Okay.  So you've indicated a line going from, let's see,

 1    northeast to southwest; is that correct?

 2    A.  That's correct.

 3    Q.  And you've drawn it sort of going towards the yard and

 4    tree area that is just north of 2088 Fry?

 5    A.  Yes, that corner house there.

 6    Q.  What did you observe when you observed the person

 7    running from the crashed Jeep in the southerly direction

 8    towards the yard there on Fry?

 9    A.  I backed my Jeep up to about where the crash location

10    was and then turned and went west on Eldridge and then south

11    on Fry.

12    Q.  Okay.  Let's see if we can -- I'm going to clear and

13    then have you draw what you did to what you just

14    described --

15    A.  Okay.

16    Q.  -- backing up a --

17    A.  Okay.  So I was here, I backed up and I turned and went

18    here (indicating) and then down this way (indicating).

19    Q.  Okay.  So you've drawn a line from just north of the top

20    intersection of Eldridge and Fry down to the secondary

21    intersection of Fry and Eldridge and then drew a line going

22    westbound on Eldridge and then southbound on Fry; is that

23    accurate?

24    A.  That's accurate.

25    Q.  Was the person you saw running southwest direction

1    towards the houses there in the yard, was that the same

2    person you saw that got out of Jeep?

3    A.  Yes.  The only person out in the neighborhood at that

4    time.

5    Q.  So describe what you saw after you saw him running and

6    you backed up and started to turn the corner there onto Fry?

7    A.  So as he ran through that first yard and got toward the

8    second one there, I was probably right in the area of the

9    southern intersection of Eldridge and Fry, if you want to

10   count them as two intersections, making the corner.  As he

11   got in front of the 2088 address, there was some tall grass

12   or bushes roughly right, I guess that would be in the north

13   part of their driveway, he went facedown into those,

14   immediately popped up, and then continued running

15   southbound.

16   Q.  So as you're turning the corner to head southbound on

17   Fry you see him running through the yard approaching 2088

18   driveway; is that correct?

19   A.  That's correct.

20   Q.  And is that where you see him fall into the tall grass?

21   A.  Yes.

22   Q.  Okay.  So describe how you saw him fall.

23   A.  It literally looked like a Superman dive, like somebody

24   grabbed your feet and he went facedown and immediately

25   popped right back up and kept running.

1    Q.   Okay.  After he got back up and continued to run did he

2    continue to run in a southerly direction along the yards on

3    Fry?

4    A.   Yes.

5    Q.   And where were you at that time?

6    A.   I was still in my Jeep on Fry, coming up toward exactly

7    where he was, so trying to catch up to him.

8    Q.   Okay.  Did you eventually -- were you eventually able to

9    pull alongside Mr. Armstrong as he was running through those

10   yards?

11   A.   Yes.

12   Q.   And approximately where was that, if you know.

13   A.   It would have probably been a house past where he fell,

14   so in the area between 2080 and 2072, somewhere in there.

15   Q.   Okay.  And what did you do when you pulled up alongside

16   him?

17   A.   I don't recall exactly how I identified myself as

18   police, whether I had the window rolled down and said

19   something or if I have just -- I have a siren in my unmarked

20   Jeep and I just chirped the siren.

21   Q.   Mm-hmm.

22   A.   But he looked over at me briefly and then turned and

23   ran, I guess it would be eastbound between those houses.

24   Q.   Okay.  And when he -- you said he turned and looked at

25   you?

1    A.  He briefly turned his head towards me, yes.

2    Q.  And just to orient the jury here, you're looking out

3    your driver's side window, the left?

4    A.  Correct.

5    Q.  Okay.  And he's during towards you, turning his face to

6    the right; is that correct?

7    A.  Correct.

8    Q.  Okay.  And he looked right at you?

9    A.  It appeared to be.

10   Q.  Okay.  And did you recognize him when he looked at you?

11   A.  From the photos I had seen, yes.

12   Q.  Okay.  You recognized him as?

13   A.  Mr. Armstrong.

14   Q.  And so you either chirped your horn or told him to stop

15   or something like that?

16   A.  Something like that, yes.

17   Q.  And what did he do after he did that -- after you did

18   that?  I'm sorry.

19   A.  He turned and cut away from me in an eastbound

20   direction.

21   Q.  So you've drawn an arrow that's sort of going in an

22   eastbound direction between 2080 and 2072 Fry; is that

23   correct?

24   A.  I believe that's between the houses that he ran, yes, it

25   was one of those houses right there.

1    Q.   Okay.  After you seen Mr. Armstrong go between those two

2    houses, did you stop your car and chase him?

3    A.   Nope.  I stopped my car but I stayed right there.

4    Q.   Okay.  And why is that?

5    A.   I was setting up the parameter.  I guess there was a

6    couple of reasons:

7         One would be to set up a parameter so that the

8    person that is being chased doesn't turn around and come

9    back.  I knew there were other officers that were in the

10   area, what we try to do then is set up a parameter, if you

11   need to then get a canine, but make sure that he doesn't

12   escape from the area where you know he's at.

13        The second reason was I didn't have a vest on.  I

14   didn't have any markings that said "police" on, so I wasn't

15   comfortable just chasing after someone who may have a

16   firearm.

17   Q.   And did you stay in the general area of Fry Street right

18   around there?

19   A.   I stayed right there until he was apprehended.

20   Q.   Okay.  And were you able to observe other squads in the

21   area that were sort of also giving chase?

22   A.   Yes, as I stopped there there were two officers that ran

23   in the same -- between the same houses that he did, running

24   after where he was and I could hear other people on the

25   radio, I was also giving directions as to where they were on

1    the radio.

2    Q.  About how long after you stopped and saw Mr. Armstrong

3    go between those two houses did you hear that he had been

4    apprehended?

5    A.  Maybe 30 seconds.

6    Q.  Maybe how long?

7    A.  30 seconds.

8    Q.  Okay.  What happened after you heard that Mr. Armstrong

9    had been arrested?

10   A.  As soon as I heard that, I turned around and drove back

11   to the scene of where his vehicle was.

12   Q.  And why did you do that?

13   A.  Well, the fact that he was secured, the only other thing

14   that I knew of that wasn't secured was his vehicle, because

15   when I left it when it was crashed in the street there was

16   nobody -- there were no other officers there, so I went back

17   to secure the vehicle.

18   Q.  And did you see the vehicle actually crashed at the

19   scene at that point?

20   A.  It was still where it was when I left, yes.

21   Q.  Okay.  And what happened after you returned to the crash

22   scene?

23   A.  When I arrived back up there somebody on the radio, I

24   believe it was Sergeant Lepinski, asked if people could

25   retrace the steps where they saw him run because they were

1    looking for evidence.

2    Q.  And you heard that over the radio?

3    A.  I did.

4    Q.  Okay.  Did you sort of acknowledge that?

5    A.  I don't recall if I actually replied to it on the radio

6    or not.

7    Q.  Okay.  And what did you do after you heard Sergeant

8    Lepinski make that statement over the radio?

9    A.  I put my vest on for two reasons:

10            One, because it has my body-worn camera;

11            Two, because I'm now walking through yards of

12    people that I don't know if I want myself to be identified

13    as a police officer.  I put my vest on and then began

14    walking the exact path where I saw him run.

15    Q.  From where to where?

16    A.  From where his crashed vehicle was through that yard

17    southwest and then in a southerly direction past the front

18    of 2088 and whatever the address is one to the north, 2096

19    maybe.

20    Q.  And did you engage your BWC to begin recording at that

21    time?

22    A.  I did.

23    Q.  And was it recording properly?

24    A.  Yes.

25    Q.  Did it actually record the path that you walked to

1    retrace the steps?

2    A.  Yes, it did.

3    Q.  Were there other officers also searching in the

4    immediate area?

5    A.  There were one or two officers that were walking either

6    to the side of me or right behind me.

7    Q.  And the purpose of that, people were just kind of

8    retracing the steps and looking around to see if anything

9    had been discarded?

10   A.  Correct.

11   Q.  Did you at any point, with those other officers nearby,

12   did you tell them what you had observed Mr. Armstrong just

13   do?

14   A.  Yeah, I told them that I -- as he ran through there I

15   saw him, that he had just fallen in the grass then popped up

16   as I was coming down the street and then ran through the

17   yards.

18   Q.  And did you point out the grass that you were talking

19   about?

20   A.  Yes, as we were walking up toward it, I think I might

21   have called it bushes because until you had actually walked

22   up there you couldn't tell that it was tall, decorative

23   grass or like rose bushes or whatever.

24   Q.  And can you indicate one more time where that grass area

25   is in relation to 2088?

1    A.  It would be just to the north of their driveway, right

2    there (indicating).

3    Q.  So you've, sir, put a red circle, sort of just north of

4    the driveway of 2088; is that right?

5    A.  That's correct.

6    Q.  So as you're walking through, what did you observe, if

7    anything, at 2088 Fry?

8    A.  So when I got up to the front I had observed that there

9    was clearly tall grass there and a -- what appeared to be

10   almost like a flattened-out area that was in the shape of a

11   person, right where he had fallen.

12   Q.  In tall grass?

13   A.  In the tall -- the grass was all flattened down in the

14   direction of the driveway, like you fell forward into it.

15   Q.  Okay.

16   A.  And then I walked around the tall grass and it's when I

17   looked down there was a handgun laying right where his right

18   arm would have been.

19   Q.  Did you note anything about the black handgun?  Were you

20   able to see it without moving grass and things like that?

21   A.  Yep, I didn't move anything.  I could clearly see,

22   though, that it had an extended magazine and a switch on the

23   back, is what we refer to them as a switch.

24   Q.  Did you have an opportunity prior to testifying to

25   review that BWC recording that you referred to?

1   A.  Yes, sir.

2   Q.  And it fairly and accurately recorded the events as you

3   had observed them that day?

4   A.  Yes.

5   Q.  I'm also going to ask you if you had the opportunity to

6   review three recordings, which are Government Exhibits 12,

7   13 and 14, before testifying today?

8   A.  Yes.

9   Q.  And are those also three short excerpts of your BWC --

10  A.  Yes.

11  Q.  -- recording?

12  A.  Yes, there's snippets taken out of it.

13  Q.  I'm sorry.

14  A.  They are snippets taken out of my recording.

15  Q.  Okay.  And generally do you recall what those snippets

16  show?

17  A.  I believe one shows me telling another officer that

18  there was a switch.  One of them shows me telling one of the

19  other officers how he fell into the grass.  I don't recall

20  what the third one is.

21  Q.  Is the third one possibly, again, as we have discussed,

22  you walking the path up to the grass?

23  A.  Yes.

24  Q.  Okay.  And, again, those short excerpts, 12, 13 and 14,

25  you've reviewed them?

 1    A.  I have.

 2    Q.  And do they fairly and accurately depict what you

 3    observed that day?

 4    A.  Yes, sir.

 5         MR. BEJAR:  The government offers Government

 6    Exhibits 12, 13 and 14.

 7         MS. ATWAL:  No objection, Your Honor.

 8         THE COURT:  Those are received at this time.

 9         MR. BEJAR:  Publishing Government Exhibit 12.

10         (Video recording playing.)

11    BY MR. BEJAR:

12    Q.  So what did we see in this part of the snippet of your

13    BWC?

14    A.  That was me walking from -- so where he crashed would

15    have been right behind me when I started walking across the

16    front of that first house over the grass that he fell in.

17    And then I walked around the grass, you could see the

18    firearm actually laying in the grass as I pulled my radio

19    out and just telling the other officers that I had located a

20    firearm.

21    Q.  How soon after you looked in the grass area that was

22    flattened where you saw Mr. Armstrong fall did you see the

23    firearm?

24    A.  It was immediately apparent.

25    Q.  Was it readily visible to you as you turned around and

1    looked?

2    A.  Yes.

3             MR. BEJAR:  I'm going to play Government

4    Exhibit 13, which is another snippet of your BWC.

5             (Video recording playing.)

6    BY MR. BEJAR:

7    Q.  And is that, again, you explaining to another officer

8    what you had just observed?

9    A.  Yes.

10            MR. BEJAR:  Playing Government Exhibit 14.

11            (Video recording playing.)

12   BY MR. BEJAR:

13   Q.  What was that?  Did you recognize your voice there?

14   A.  Yes, I was just informing the other officer that the

15   firearm had a switch.

16   Q.  And this is just a couple of seconds after you had found

17   it and other officers are responding to the area?

18   A.  Yes.

19   Q.  I'm not sure if I asked you this or not but did you have

20   to move the grass around to observe the firearm?

21   A.  Not at all.

22   Q.  I want you to look in the exhibit binder that's in front

23   of you and turn to Tab 15, which is Government Exhibit 15.

24   It should be two pages, two photos; is that correct?

25   A.  Yes.

1    Q.  Do you recognize those?

2    A.  I do.

3    Q.  What do you recognize those two photos to be?

4    A.  They're different spots, I believe probably off of my

5    body cam or still photo that show the tall, grassy area

6    where Mr. Armstrong fell when he was running.

7    Q.  Do they fairly and accurately depict what you observed?

8    A.  Yes, they do.

9              MR. BEJAR:  Government offers Government

10   Exhibit 15.

11             MS. ATWAL:  No objection.

12             THE COURT:  Received.

13   BY MR. BEJAR:

14   Q.  This is Government Exhibit 15, page 1.  And what do we

15   see here?

16   A.  We see a still photo of, I believe it was from when I

17   was walking up to the grassy area where Mr. Armstrong fell.

18   Q.  And I'm just going to zoom in on this area here,

19   (indicating).

20             Can you describe what we see on this zoomed in

21   area?

22   A.  Yeah, you can see kind of the flattened out area of the

23   grass, because that's all like a decorative grass in the

24   front yard where it's flattened down.

25   Q.  And could you, perhaps, just draw with your finger the

1    area where you observed flattened down.

2    A.   It actually appears on this to be two areas that are

3    flattened down.   This also looks like it may be flattened

4    there (indicating).

5    Q.   And what do we see here?

6    A.   That's looking from the other side.   You can see the

7    grass is all flattened in that direction and that's the

8    firearm down in the bottom left, the center left of this

9    photo.

10   Q.   And then this is sort of right after.   I believe we

11   see -- what do we see in the upper corner of this picture,

12   the upper right-hand corner?

13   A.   That's an ATF agent who walking with me or walking

14   behind me.

15   Q.   I'm sorry.   The very corner.   Do you see -- is that part

16   of your arm there?

17   A.   Oh, on the upper right, yes.

18   Q.   Yes.   And that you reaching for your walkie-talkie to --

19   is this basically when you're saying, I found the gun here?

20   A.   I believe I grabbed my walkie-talkie right after that,

21   yes.

22   Q.   Okay.   Is that the firearm that you saw laying in the

23   grass near the flattened section?

24   A.   Yes, it is.

25   Q.   Now you mentioned, you said right where his right arm or

1    hand would be, could you indicate that?  Is that visible

2    here?

3    A.  You can't really see it in this picture, but literally

4    there was an outline of a body here that looks like arms

5    kind of came out that way (indicating).  You can kind of see

6    the shape of the body here and it was flattened out, like an

7    arm that way and an arm this way, like someone had run,

8    fallen, and gotten back up.

9    Q.  So the area that you've indicated, is that an area

10   that's sort of, for the record, is that going towards where

11   the firearm is?

12   A.  This grass appears to be going toward the firearm.  Most

13   of the grass in the middle is going toward the driveway

14   where I was standing.

15   Q.  And is that where you saw Mr. Armstrong fall?

16   A.  Yes, it is.

17   Q.  Were you able to observe any characteristics of the

18   firearm as it lay in the grass?

19   A.  Yes, I believe I already said it had an extended

20   magazine and it had a switch on the back.

21   Q.  Have you previously observed firearms with switches?

22   A.  Yes, I have.  Multiple.

23   Q.  Multiple times?

24   A.  Yes.

25   Q.  What did you do after you found the firearm?

1    A.  I remained there until I think another officer was

2    directed to come, put some gloves on and recover it.

3    Q.  And was the firearm photographed in place?

4    A.  As far as I know, yes.  I did not do it, but yes.

5    Q.  Okay.  And other officers at the scene recovered it and

6    took it into evidence?

7    A.  Yes.

8    Q.  And what did you do after that, sir?

9    A.  I went back up to where he had crashed again to make

10   sure if somebody was going to write an accident report, I

11   actually contacted Roseville Police Department, they offered

12   to come out and take care of that.  And then just some

13   other, you know, administrative duties that we were out

14   there to make sure that we had everything we needed.

15              MR. BEJAR:  May I have a moment, Your Honor?

16              THE COURT:  You may.

17              (Counsel confer).

18              MR. BEJAR:  Thank you, Your Honor.  I have no

19   further questions at this time.

20              THE COURT:  You may inquire whenever you're ready,

21   counsel.

22              MS. ATWAL:  Thank you, Your Honor.

23                          **CROSS-EXAMINATION**

24   BY MS. ATWAL:

25   Q.  Good afternoon, Lieutenant Waite.

1    A.  Good afternoon.

2    Q.  Lieutenant Waite, let me get this right, you didn't have

3    your body-worn camera on until the very end, correct?

4    A.  That's correct.

5    Q.  Isn't that against policy of Minneapolis Police?

6    A.  No, it is not.

7    Q.  You don't have to have your body-worn camera on?

8    A.  You do not need to wear -- I don't have it right now and

9    I'm still a police officer.

10   Q.  When you're investigating a case do you have to have

11   your body-worn camera on?

12   A.  No, you don't.

13   Q.  Okay.  When do you have to have that on?

14   A.  If you're in uniform, if you are making an arrest, if

15   you are going to identify yourself as a police officer.

16           So undercover officers or surveillance officers

17   that aren't planning on being part of a takedown would not

18   wear their body camera.

19   Q.  Okay.  You chose to put it on right after the arrest; is

20   that right?

21   A.  That's correct.

22   Q.  Okay.  You didn't put it on before then?

23   A.  I wasn't wearing it before then, no.

24   Q.  Okay.  You chose not to put it on, right?

25   A.  As my role there, I was not --

1    Q.  I understand what your role was, but you chose not to

2    put it on, correct?

3    A.  That's correct.

4    Q.  And you then say that you in your vehicle followed Mr.

5    Armstrong, correct?

6    A.  That's correct.

7    Q.  And during that time you didn't put your vest on or

8    anything, right?

9    A.  Kind of hard to do that while you're driving but no, I

10   did not.

11   Q.  You didn't put it on, did you?

12   A.  I did not.

13   Q.  And did you keep your eyes on Mr. Armstrong?

14   A.  Yes, I did.

15   Q.  The entire time from when he starts running?

16   A.  From every second that I could actually see him.  I may

17   have lost him briefly as I went around when I backed up to

18   turn, I may have lost him for a step or two but, yes, that

19   my focus was on him, not on my vest in the back seat.

20   Q.  Okay.  So you keep your eyes on him and you claim that

21   he fell in the grass, correct?

22   A.  Correct.

23   Q.  Fell one time?

24   A.  One time.

25   Q.  And I think your words were, "he immediately got up"; is

1    that right?

2    A.  He did.

3    Q.  He didn't try and shuffle around in the grass, he got up

4    and ran again?

5    A.  Not that I saw.  He appeared to fall down and pop right

6    back up.

7    Q.  Okay.  The entire time you had eyes on him, did you see

8    an object in his hand?

9    A.  I did not.

10   Q.  Did you see him maneuvering his hands up by his chest

11   where the satchel or fanny pack would be?

12   A.  I was -- literally the entire time I saw him was from

13   behind so, no, I couldn't see what his hands were doing in

14   front of him at all.

15   Q.  Okay.  Did you see his hands to the front or to the side

16   of him?

17   A.  I realistically was concentrating on where he was.  I

18   didn't recall seeing his hands at all.

19   Q.  Okay.  If you saw his hands doing something nefarious

20   would you have called that out?

21   A.  I would have, yes.

22   Q.  Now, the first time you went to 1028 [sic] Fry was on

23   October 12th, 2021, correct?

24   A.  As far as I know, yes.  I don't recall ever being there

25   before.

1    Q.  And that was soon after the arrest, correct?

2    A.  Correct.

3    Q.  On that day, on 10/12/2021, you did not see Mr.

4    Armstrong throw a firearm, did you?

5    A.  I did not.

6    Q.  On 10/12/2021 you did not see Mr. Armstrong drop a

7    firearm, did you?

8    A.  No, Ma'am.

9    Q.  On 10/12/2021 you did not see Mr. Armstrong possess a

10   firearm, did you?

11   A.  I did not.

12            MS. ATWAL:  Thank you.  I have nothing further.

13            THE COURT:  Any additional inquiry, counsel?

14                    **REDIRECT EXAMINATION**

15   BY MR. BEJAR:

16   Q.  A quick point of clarification.

17            Had you had your BWC vest on while you were

18   driving, what would be the angle?

19   A.  Mine generally sits just below the center of my chest

20   and I've seen body cam video when I have been driving, it

21   literally just catches the dashboard and the steering wheel.

22   Q.  The steering wheel and the front dash?

23   A.  Yep.  And the sky up here, but nothing at eye level --

24   Q.  Nothing --

25   A.  -- or below --

1    Q.  Nothing at eye level of what your visually --

2    A.  That's correct.

3    Q.  And you testified, I believe, that you were -- when you

4    were coming down Fry Street you were behind Mr. Armstrong;

5    is that correct?

6    A.  That's correct.

7    Q.  And he was running?

8    A.  He was running.

9    Q.  Okay.  So your view was from behind him, you didn't see

10   the front of him?

11   A.  Correct.

12   Q.  And even when you saw him fall in the grass you were

13   still behind him; is that correct?

14   A.  I was still a distance away, yes.

15   Q.  Okay.  And the grass area that we saw on the exhibit is

16   where you saw him fall?

17   A.  That's correct.

18        MR. BEJAR:  No further questions.

19        THE COURT:  Anything further, Ms. Atwal?

20        MS. ATWAL:  No, Your Honor.  Thank you.

21        THE COURT:  You may step down, Officer.  Thank

22   you.

23        THE WITNESS:  Thank you, Your Honor.

24        (Testimony concluded at 2:06 p.m.)

25          *              *              *

1                              **REPORTER'S CERTIFICATE**

2

3

                I certify the foregoing pages of typewritten
4    material constitute a full, true and correct transcript of
     my original stenograph notes, as they purport to contain, of
5    the proceedings reported by me at the time and place
     hereinbefore mentioned.

6

7                              /s/Lynne M. Krenz
                               Lynne M. Krenz, RMR, CRR, CRC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25